2016 IL App (3d) 140591

Opinion filed September 8, 2016

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2016

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal Nos. 3-14-0591 and 3-14-0695 Circuit No. 07-CF-516 |
| JUAN NESBIT, | ) ) ) | Honorable David A. Brown, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE CARTER delivered the judgment of the court, with opinion.
Justices McDade and Wright concurred in the judgment.

_____

**OPINION**

¶ 1        Defendant, Juan Nesbit, appeals from the second-stage dismissal of his postconviction petition. He argues that the claims presented in that petition made substantial showings of constitutional violations and thus warranted third-stage review. In a consolidated appeal of the denial of his motion to reconsider sentence, defendant also argues that the sentence imposed by the trial court was excessive and an abuse of discretion. For the reasons set forth below, we reverse the trial court's dismissal of defendant's postconviction petition as to one claim and affirm as to the remainder. Further, we affirm defendant's sentence.

¶ 2                                                    FACTS

¶ 3          The State charged defendant with being an armed habitual criminal (720 ILCS 5/24-1.7(a) (West 2006)), unlawful possession of a weapon by a felon (UPWF) (720 ILCS 5/24-1.1(a) (West 2006)), and aggravated unlawful use of a weapon (AUUW) (720 ILCS 5/24-1.6(a)(1) (West 2006)). Each of the counts alleged that defendant knowingly possessed a handgun on May 5, 2007.

¶ 4          Defendant appeared in court in custody on May 7, 2007, represented by an attorney from the public defender's office. The trial court set defendant's bond at $35,000, 10% to apply. Defendant remained in custody when he was arraigned on May 24, 2007, represented by a different attorney from the public defender's office. Defendant posted bond on June 7, 2007.

¶ 5          Upon posting bond in the present case, defendant was immediately taken into custody by the Department of Corrections (DOC), as he had been on parole for an earlier conviction. On June 21, 2007, defendant wrote a letter to trial judge Michael Brandt, informing him that he was in the custody of the DOC at the Pinckneyville Correctional Center. The court ordered the *ex parte* communication delivered to the attorneys of record. Defendant next appeared in court on August 3, 2007. At that appearance, assistant Public Defender Mark Rose relayed to the court that defendant was "on bond on this matter and is in custody of the [DOC] on a previous cause." The court granted defendant's motion for a continuance.

¶ 6          On October 25, 2007, attorney Ronald Hamm entered his appearance as counsel of record for defendant. On February 4, 2008, with the trial scheduled for the following day, the court ordered defendant remanded to the custody of the Peoria County Sheriff in anticipation of trial.

¶ 7          On February 5, 2008, the State answered that it was ready for trial. Hamm made an oral motion to continue the trial to a later date. Hamm stated:

"I informed the Court yesterday morning that [defendant] had requested that I *** make a motion for a continuance.

[Defendant] also yesterday for the first time informed me that at the time that he was taken to the hospital after his arrest that his blood sugar was extremely elevated, which may have affected some of—some statements that he allegedly made to the officers.

I first became aware of that yesterday morning. I would need to check that and determine whether or not that would have any [effect] on [defendant's] condition at the time ***."

The court denied the motion as untimely.

¶ 8    On February 6, 2008, defendant filed an assignment of security for bail, assigning the $3500 previously posted as bond to Hamm in exchange for value received. The trial started the same day.

¶ 9    Prior to calling any witnesses, the prosecutor read two stipulations to the jury. The first stipulation was that Michael Arrington would testify that he was defendant's parole officer and that defendant was on parole on May 5, 2007, the date of the alleged offenses. The second stipulation was that defendant had previously been convicted of burglary in 1985, 1993, and 2002.

¶ 10    Peoria police officer Jarvis Harrison testified that at approximately 8:30 p.m. on May 5, 2007, he received a dispatch informing him that a black Corvette had been seen leaving the scene of a domestic dispute. The dispatch indicated that the car was being driven by a person named Nesbit. After locating the vehicle, Harrison ran the license plate. The car was registered to Sonja Nesbit. Harrison activated his lights and sirens and pursued the vehicle.

¶ 11    Harrison testified that the vehicle did not immediately pull over. After stopping at a stop sign, the car "took off at a high rate of speed." Harrison continued to pursue the vehicle for approximately 10 to 15 minutes, with officer Rory Poynter later joining the chase. The vehicle eventually came to a stop after hitting a curb.

¶ 12    When the vehicle stopped, Poynter's squad car was directly behind it, and Harrison's squad car was directly behind Poynter's. Harrison and Poynter each alighted from their cars. Poynter gave the driver of the vehicle a number of commands, but the driver did not obey. The driver did not exit the vehicle. Harrison testified that he observed the driver reach under the driver's side seat with both hands. Harrison stated that the driver appeared to be moving his hands back and forth in some fashion. The driver eventually got out of the vehicle, and Poynter took him into custody. A subsequent search of the vehicle revealed a handgun located, in Harrison's words, "[r]ight by the driver's seat." Harrison testified that he could see the butt of the handgun sticking out from under the driver's seat. Harrison identified defendant as the driver of the vehicle.

¶ 13    On cross-examination, Harrison admitted that he never saw defendant with the gun in his hands. Though he saw defendant reach toward the area under the seat, he did not know if defendant's hands actually went under the seat.

¶ 14    Poynter testified that he joined the pursuit of defendant's vehicle after Harrison. Poynter eventually overtook Harrison, becoming the primary officer in pursuit. Poynter testified that he was in pursuit of defendant's vehicle for two to three minutes, describing the chase as taking place at "[r]elatively slow speeds, approximately 25, 30 [miles per hour]." Defendant applied the brakes as the vehicle approached a curb and came "to a screeching halt" when it impacted.

¶ 15        Poynter testified that he exited his squad car with his gun drawn. The driver's door of defendant's vehicle swung open. Poynter ordered defendant to exit the vehicle with his hands up. Defendant did not comply. Defendant's left arm was raised, but his right arm was not clearly visible. Poynter testified that defendant "continued to reach down towards the floorboard." Poynter holstered his gun and drew his Taser. Poynter struck defendant twice with the Taser to no effect, and he switched back to his gun. As Poynter continued to order defendant out of the vehicle, defendant reached toward the driver's floorboard once more, this time with both hands. After a number of other officers arrived, defendant complied with Poynter's order to exit the car and lie on the ground.

¶ 16        Upon searching the vehicle, Poynter noticed the butt of a handgun protruding from under the driver's seat. Poynter identified People's exhibit No. 2 as a photograph of the handgun as it existed when Poynter first observed it. The photograph shows the butt of the handgun visible, emerging from under the driver's seat, with the remaining portion of the gun obscured by the seat itself. The visible portion the silver gun stands out against the vehicle's red interior. Further inspection revealed that the handgun was loaded. Poynter identified the handgun as .45-caliber. Poynter testified that defendant's mother, Sonja Nesbit, and wife, Cheryl Nesbit, eventually arrived at the scene of the accident.

¶ 17        On cross-examination, Hamm asked Poynter about defendant's blood sugar at the time of the accident. Poynter responded that paramedics had come to the location, checked defendant's blood sugar, and indicated that Poynter could transport defendant to the hospital. Poynter also testified on cross-examination that he never saw defendant with the gun in his hands.

¶ 18        Officer Scott Bowers of the Peoria police department testified that he found a partial fingerprint on the frame of the handgun found in the vehicle driven by defendant. The partial

fingerprint did not yield any matches. Bowers did not find any latent fingerprints on any of the bullets found within the handgun.

¶ 19    The State called defendant's mother, Sonja Nesbit, as its final witness. Sonja testified that the black Corvette was registered in her name and that she, defendant, and Cheryl all drove the vehicle. Sonja had last driven the vehicle on May 4, 2007, one day before the defendant's accident. Sonja recalled that Cheryl had driven the car "[t]hat same day."[1]

¶ 20    Sonja testified that she went to the scene of the accident on the evening of May 5, 2007, but that she did not talk to any officers there. Cheryl was with her. Sonja wanted to remove her belongings from the car before it was towed. When asked if she was able to retrieve items from the car without ever speaking to an officer, Sonja replied: "They might have asked me if [the car] was mine." When asked by the prosecutor if she had told Poynter, "I pay for it but [defendant] is the only one who drives it," Nesbit replied, "No, I didn't say that." Sonja explained: "But I don't say he's the only one that drives it when I drive it and Cheryl drives it."

¶ 21    On cross-examination, Sonja testified that she owned a .45-caliber handgun and that she kept it "underneath the front seat." She had never seen defendant in possession of the gun and never told defendant it was under the seat.

¶ 22    Following Sonja's testimony, the State recalled Poynter. Poynter testified that he spoke to Sonja on May 5, 2007. He asked her who usually drove the black Corvette. The prosecutor then asked: "[D]id she answer that she paid for it but [defendant] is the only one who drives it?" Poynter replied: "Correct."

---

[1]By "[t]hat same day," it is unclear if Sonja meant that Cheryl had also last driven the car on May 4, 2007, or if Cheryl had driven the car the same day as the incident in question. In any event, Sonja testified that Cheryl also drove the vehicle and had done so quite recently.

¶ 23    On cross-examination, Poynter testified that Cheryl was also present during his conversation with Sonja. At that time, Poynter knew Sonja from previous interactions with her. The following exchange between Hamm and Poynter ensued:

"Q. You'd seen her operating that vehicle, hadn't you?

A. No, sir, I had not.

Q. You'd seen it parked at her house, hadn't you?

A. No, sir, I had not seen that vehicle prior to that.

Q. Had you ever seen her in a vehicle?

A. Yes, sir.

Q. What kind of other vehicle did you see her in?

A. I believe a Mitsubishi Eclipse.

Q. How long ago was that?

A. Just days prior to the incident."

Poynter also asked Sonja if she owned a gun. He could only recall that she responded by stating that she owned a FOID card.

¶ 24    In his closing argument, spanning 11 pages of the report of proceedings, Hamm argued that the State had not proven that defendant knew the gun was in the car. He pointed out that there was no evidence that defendant was actually reaching for anything under the seat, only that his hands were in that area. Hamm also emphasized Sonja's testimony, pointing out that the gun belonged to her and insisting that defendant could not be assumed to know every item in the car. Finally, Hamm discussed defendant's trip to the hospital, suggesting that defendant's ill state may have contributed to the events in question.

¶ 25        On February 7, 2008, the jury found defendant guilty on all counts. The trial court revoked defendant's bond. On February 12, 2008, defendant filed a posttrial motion asserting that he had not been proven guilty beyond a reasonable doubt.

¶ 26        On May 2, 2008, the court denied defendant's motion and proceeded to sentencing. The presentence investigation report (PSI) showed that defendant had been convicted of 18 separate criminal offenses between 1984 and 2002, not including the three burglary convictions used as predicate offenses of his conviction for being an armed habitual criminal. Defendant's criminal history included two misdemeanor drug-related convictions; misdemeanor convictions for theft, retail theft, and unlawful use of weapons; felony convictions for unlawful use of a credit card, unlawful possession of a hypodermic syringe, unlawful possession of a weapon by a felon, and theft; two convictions for aggravated fleeing and eluding a peace officer; and seven convictions for felony retail theft. Following his most recent conviction, defendant was released on parole on December 15, 2006, less than five months before the incident giving rise to the present case.

¶ 27        The PSI indicated that defendant graduated from high school and had taken some college courses. He had five sons. A number of individuals wrote letters to the court on behalf of defendant, including Sonja and former teachers and supervisors of defendant. In total, nine mitigation letters were delivered to the trial court. In allocution, defendant stated that he was ashamed of his criminal history and that he wanted to spend more time with his 68-year-old mother.

¶ 28        The trial court entered judgment only on the charge of being an armed habitual criminal, a Class X felony. The court sentenced defendant to a term of 23 years' imprisonment. The sentencing order provided that defendant would be credited with time served between May 6,

2007, and June 7, 2007 (32 days), as well as between February 7, 2008, and May 2, 2008 (85 days). Defendant did not file a postsentencing motion.

¶ 29    On appeal from his conviction, defendant raised three issues: (1) he was not proven guilty beyond a reasonable doubt; (2) the prosecutor improperly elicited testimony regarding defendant's postarrest silence; and (3) trial counsel was ineffective for not surrendering defendant's bond after he was taken into DOC custody. *People v. Nesbit*, 398 Ill. App. 3d 200, 208 (2010). In an opinion filed on February 11, 2010, this court rejected defendant's sufficiency of the evidence argument. *Id*. at 211. While we agreed that the testimony regarding defendant's postarrest silence was improper, we found that it did not amount to plain error, as the evidence at trial was not closely balanced. *Id*. at 212-13. Finally, a majority of this court found that the record on appeal was inadequate to resolve the ineffective assistance claim, noting that too many factual questions remained unanswered. *Id*. at 215. The majority found that "[d]efendant's claim would best be presented as a postconviction matter where an adequate record can be developed." *Id*. The dissenting justice would have found counsel ineffective and granted defendant the credit for time served he would have received had he surrendered his bond. *Id*. at 215-16 (O'Brien, J., concurring in part and dissenting in part).

¶ 30    On May 10, 2010, defendant filed a *pro se* petition for postconviction relief, raising numerous claims of ineffective assistance of trial counsel (as well as claims of ineffective assistance of appellate counsel for failing to raise those same claims on appeal). Specifically, defendant contended that trial counsel was ineffective for failing to call Cheryl as a witness. In an affidavit attached to the petition, Cheryl stated that if called as a witness, she would have testified that she drove the black Corvette several times and had been a passenger in that car while defendant drove it earlier in the day on May 5, 2007. She would testify that neither she nor

defendant checked under the seat at that time. Cheryl would also testify that Sonja told an officer at the scene that the gun belonged to her (Sonja) and that she did not recall Sonja telling an officer that defendant was the only person who drove the vehicle.

¶ 31        Defendant also claimed that counsel had been ineffective for eliciting harmful testimony from a State's witness, namely, Poynter's testimony that he had only ever seen Sonja driving a Mitsubishi Eclipse. He also claimed counsel was ineffective for failing to investigate and present evidence that defendant's blood sugar was high at the time of the incident, which caused him to slump in the driver's seat in a manner that gave the appearance of reaching under the seat. Defendant attached to the petition medical records from the night of the incident, which indicated defendant had been treated for hyperglycemia. The public defender's office was appointed to represent defendant on his petition on August 5, 2010. After seeking and being granted 17 continuances, counsel for defendant filed a supplemental petition on June 24, 2013.

¶ 32        The supplemental petition added, *inter alia*, a claim that trial counsel had been ineffective for failing to surrender defendant's bond, which would have enabled defendant to receive additional credit against his sentence. Counsel later filed a second supplemental petition, which added a claim that trial counsel had been ineffective for failing to file a motion to reconsider sentence. Attached to that petition was an affidavit in which defendant stated he met with attorney Rose, of the public defender's office, on August 3, 2007, and that Rose did not inform him that he could receive credit for the time he was currently serving if he surrendered his bond. Defendant further swore that he met with Jeffrey Flanagan—an associate of Hamm, defendant's eventual trial counsel—on October 26, 2007, and that Flanagan also did not discuss the potential surrender of bond or sentencing credit. Defendant averred that in both instances, had he been informed that he could receive credit for time served by surrendering his bond, he would have

done so. Finally, defendant averred that Hamm approached him before trial in regard to assigning his bond in payment of Hamm's fees. Defendant stated: "This was the one and only occasion in which I had a discussion with anyone, including assigned or private counsel, about assigning posted fund to private counsel for legal services rendered."

¶ 33    The State filed a motion to dismiss defendant's petition, and a hearing followed. After the hearing, the trial court advanced to the third stage the claim that counsel was ineffective for failing to file a motion to reconsider sentence but dismissed the remainder of defendant's claims. Following a third-stage evidentiary hearing on the surviving claim, the trial court found counsel ineffective and issued an order allowing defendant to file a motion to reconsider the sentence.

¶ 34    On July 30, 2014, defendant filed an appeal from the second-stage dismissal of the majority of his postconviction claims. That appeal was assigned case No. 3-14-0591.

¶ 35    Defendant subsequently filed a motion to reconsider sentence, which was denied on September 5, 2014. Defendant filed an appeal from that ruling, and that appeal was assigned case No. 3-14-0695. Defendant's two appeals have been consolidated.

¶ 36                                    ANALYSIS

¶ 37    On the appeal from the dismissal of his remaining postconviction claims, defendant argues that a number of those claims made a substantial showing of a constitutional violation. First, defendant contends that his claim that trial counsel was ineffective for failing to surrender his bond should be advanced to the third stage of postconviction proceedings. Defendant also maintains that he is entitled to a third-stage evidentiary hearing because he made a substantial showing that trial counsel was ineffective for (1) failing to call Cheryl Nesbit as a witness, (2) eliciting damaging testimony from Poynter, and (3) failing to investigate defendant's medical

condition. Finally, on his appeal from the denial of his motion to reconsider sentence, defendant argues that the court's sentence of 23 years' imprisonment was excessive.

¶ 38    Upon review, we find that defendant's claim relating to the surrender of bond made a substantial showing of ineffective assistance of counsel and thus warrants a third-stage evidentiary hearing. Specifically, defendant substantially showed that his attorneys' failure to inform him of his option to surrender his bond constituted deficient performance and that failure was prejudicial in that it resulted in defendant not being credited with 246 days spent in custody. Defendant's three remaining claims of ineffectiveness, however, failed to make a substantial showing of ineffective assistance of counsel. Given the overwhelming evidence against defendant, the record refutes any conclusion that those alleged instances of deficient performance—considered individually or in aggregate—would undermine confidence in the jury's verdict. Finally, we find that where the trial court imposed a sentence within the statutory range and where a stricter sentence was called for by defendant's extensive criminal history and parole status at the time of the offense, the trial court did not abuse its discretion in sentencing defendant to a term of 23 years' imprisonment.

¶ 39                        I. Postconviction Proceedings

¶ 40    The Post-Conviction Hearing Act (Act) provides a three-stage framework under which imprisoned defendants may raise claims of substantial denial of their constitutional rights. See 725 ILCS 5/122-1 *et seq.* (West 2010); *People v. Tate*, 2012 IL 112214, ¶ 10. At the second stage of postconviction proceedings, a claim will be dismissed unless "the petition and any accompanying documentation make 'a substantial showing of a constitutional violation.' " *Tate*, 2012 IL 112214, ¶ 10 (quoting *People v. Edwards*, 197 Ill. 2d 239, 246 (2001)). If a defendant

successfully makes such a showing, the claim will be advanced to third-stage proceedings, at which point the trial court conducts an evidentiary hearing on the issue. *Id.*

¶ 41    In *People v. Domagala*, 2013 IL 113688, our supreme court explained the requirements at the second stage of postconviction proceedings:

> "The second stage of postconviction review tests the legal sufficiency of the petition. Unless the petitioner's allegations are affirmatively refuted by the record, they are taken as true, and the question is whether those allegations establish or 'show' a constitutional violation. In other words, the 'substantial showing' of a constitutional violation that must be made at the second stage [citation] is a measure of the legal sufficiency of the petition's well-pled allegations of a constitutional violation, *which if proven* at an evidentiary hearing, would entitle petitioner to relief." *Id.* ¶ 35 (quoting *Edwards*, 197 Ill. 2d at 246).

We apply *de novo* review to a trial court's dismissal of postconviction claims at the second stage of postconviction proceedings. *People v. Coleman*, 183 Ill. 2d 366, 378 (1998).

¶ 42    Claims of ineffectiveness of counsel are constitutional claims cognizable under the Act. *E.g.*, *People v. Jones*, 191 Ill. 2d 354, 359 (2000). To prevail on a claim on ineffective assistance of counsel, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness (deficient performance) and (2) "there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different' " (prejudice). *Domagala*, 2013 IL 113688, ¶ 36 (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)). A reasonable probability exists that the outcome would have been different but for counsel's deficient performance where those errors undermine confidence in the outcome of the proceedings. See *Washington*, 466 U.S. at 694.

¶ 43

¶ 44    A criminal defendant is entitled to credit against his sentence for each day he spends in pretrial custody. 730 ILCS 5/5-8-7(b) (West 2006). Our supreme court has clarified that "a defendant who is out on bond on one charge, and who is subsequently rearrested and returned to custody on another charge, is not returned to custody on the first charge [for the purposes of custody credit] until his bond is withdrawn or revoked."[2] *People v. Arnhold*, 115 Ill. 2d 379, 383 (1987). Once a defendant in that scenario withdraws or surrenders his bond, he is considered in custody on both offenses and earns credit against each for each day in custody. *People v. Robinson*, 172 Ill. 2d 452, 459-63 (1996).

¶ 45    In *People v. Centeno*, 394 Ill. App. 3d 710 (2009), a majority of this court found that counsel had been ineffective for failing to surrender defendant's bond. In that case, as here, the defendant was free on bond when he was taken into custody on a different charge. *Id.* at 712. In finding counsel's performance deficient, the majority noted that

> "In an instance where defense counsel is aware that the defendant is in custody in another jurisdiction, '[i]t behoove[s] defense counsel to move to withdraw the bond posted in the instant case in order to allow the defendant to earn credit against his eventual sentences in the instant case at the same time that he earned credit against his sentence in the [other jurisdiction].' " *Id.* at 714 (quoting *People v. DuPree*, 353 Ill. App. 3d 1037, 1049 (2004)).

The majority concluded that had defendant received effective assistance, "counsel would have moved to surrender the defendant in exoneration of [defendant's] bond," and defendant would

---

[2]We note that phrases such as "withdraw bond," "surrender bond," "exonerate bond," and "surrender in exoneration of bond," are used synonymously. *E.g.*, *People v. DuPree*, 353 Ill. App. 3d 1037, 1048 (2004); *People v. Centeno*, 394 Ill. App. 3d 710, 714 (2009).

have received credit for 301 days spent in simultaneous custody. *Id.* Notably, the dissenting justice in *Centeno* would have rejected the notion that failure to surrender bond is *per se* deficient, noting that the record was silent as to key questions of fact, such as counsel's and the defendant's positions on the surrender of bond. *Id*. at 715 (Schmidt, J., dissenting).

¶ 46    In defendant's first appeal, in which he raised this same issue, the majority adopted the dissent's approach in *Centeno*. *Nesbit*, 398 Ill. App. 3d at 215. That is, the majority found that too many factual questions existed to resolve the claim on direct review. Echoing the sentiments of the *Centeno* dissent, the majority in *Nesbit* pointed out that the record was silent as to any discussions between counsel and defendant regarding the surrendering of bond and was similarly silent as to defendant's preference on the matter. *Id.* The dissenting *Nesbit* justice would have adhered to the majority in *Centeno*, found counsel ineffective, and granted defendant the credit outright. *Id*. at 215-16 (O'Brien, J., concurring in part and dissenting in part).

¶ 47    In an affidavit attached to his postconviction petition, defendant alleged that neither Rose nor Hamm's associate ever informed him that he could surrender the $3500 he posted as bond in order to receive sentencing credit. Defendant further averred that if either of those attorneys had so informed him, he would have chosen to surrender his bond. Taking these facts as true—as we must do at this stage when not rebutted by the record (see *Domagala*, 2013 IL 113688, ¶ 35)—it is clear that defendant has made a substantial showing of ineffective assistance of counsel. The failure of defense counsel to notify a defendant of his option to surrender bond and receive credit for the time he is spending in custody is objectively unreasonable, in satisfaction of the deficient performance prong. Of course, the prejudice to defendant is clear: but for counsels' deficient performance, defendant would have surrendered his bond and received credit for the 246 days he was imprisoned between June 7, 2007, and February 7, 2008.

¶ 48    To be clear, defendant is not seeking on this appeal the credit for time served, nor is he seeking a finding that counsel was ineffective. Defendant's request for relief is only that we remand for a third-stage evidentiary hearing. Accordingly, we need not weigh in on any conflict between this court's decisions in *Centeno* and *Nesbit*. The issue that divided those panels was the presence of factual questions pertaining to the surrender of bond. In the present case, any such questions can and should be resolved at the third-stage evidentiary hearing. *Id.* ¶ 34.

¶ 49    Further, we find the State's argument that defendant has forfeited this issue to be unpersuasive. The State argues that "defendant chose not to forfeit his bail when he was held in custody on the parole violation. Instead, the defendant chose to hire a private attorney to defend him and he assigned his bail to that attorney." The State's characterization of defendant as making a *choice* to not surrender his bond completely ignores defendant's allegations. Defendant could not be expected to surrender his bond if, as he alleges, neither of his attorneys ever informed him of that option. Nor can defendant's later assignment of the bond be held against him, if it was done without knowing his other options. Accordingly, we reverse the dismissal of defendant's ineffectiveness claim and remand for an evidentiary hearing on the issue.

¶ 50                              B. Other Claims of Ineffectiveness

¶ 51    Defendant next contends that three further claims of ineffective assistance of counsel should have been advanced to a third-stage evidentiary hearing. Those claims are that counsel was ineffective for (1) failing to call Cheryl as a witness at trial, (2) eliciting harmful testimony from Poynter, and (3) failing to consult with defendant and investigate his medical condition. Defendant argues that each of these instances of allegedly deficient performance was individually prejudicial—that is, he argues that each error undermines confidence in the jury's

- 16 -

verdict. He further argues that those three instances of allegedly deficient performance, when considered in aggregate, undermine confidence in the jury's verdict.

¶ 52　　　Before proceeding to defendant's claims, we note that defendant's trial turned on the issue of constructive possession. See *Nesbit*, 398 Ill. App. 3d at 208-211. To sustain a conviction for being an armed habitual criminal in the present case, the State was obligated to prove, *inter alia*, that defendant possessed a firearm. 720 ILCS 5/24-1.7(a) (West 2006). "Criminal possession may be actual or constructive; and where \*\*\* the possession was allegedly constructive, the State [has] to prove that defendant (1) had knowledge of the presence of the weapon, and (2) had immediate and exclusive control over the area where the weapon was found." *People v. Ingram*, 389 Ill. App. 3d 897, 899-900 (2009). Here, the defense theory was that defendant had no knowledge of the presence of the weapon. Thus, on this appeal, defendant contends that counsel's deficient performance was prejudicial as it relates to that specific element.

¶ 53　　　　　　　　　　　　　　　1. Cheryl Nesbit

¶ 54　　　Defendant first argues that counsel was ineffective for failing to call Cheryl as a witness at trial. Defendant maintains that Cheryl's testimony that she also drove the car and did not know the gun was in the car would demonstrate that being in the car without knowledge of the gun was possible and thus support his defense that he was unaware of the presence of the gun. Cheryl's testimony, defendant points out, would have also corroborated Sonja's testimony that defendant was not the only person who drove the car.

¶ 55　　　It is well settled that counsel's decisions regarding the calling of witnesses at trial are generally immune from claims of ineffective assistance. *E.g.*, *People v. Enis*, 194 Ill. 2d 361, 378 (2000). Our supreme court has explained:

- 17 -

"[D]ecisions concerning whether to call certain witnesses on a defendant's behalf are matters of trial strategy, reserved to the discretion of trial counsel. [Citations.] Such decisions enjoy a strong presumption that they reflect sound trial strategy, rather than incompetence [citation], and are, therefore, generally immune from claims of ineffective assistance of counsel [citation]. This is not the case, however, where counsel's strategy was so unsound that no meaningful adversarial testing was conducted." *Id.*

¶ 56      Defendant has not argued—either in this appeal or in his postconviction petition—that trial counsel's strategy was so unsound that no meaningful adversarial testing was conducted. Indeed, such an argument would be contradicted by the record. Though the defense did not call any witnesses of its own, counsel evoked testimony on cross-examination of all witnesses that directly supported its theory of the case. Counsel elicited testimony from Harrison and Poynter that they had not actually seen defendant with the gun. Harrison testified on cross-examination that he could not even see defendant's hands actually go under the driver's seat. Most importantly, counsel elicited testimony from Sonja that the gun belonged to her, that she had never seen defendant with it, and she had never told him about it. Moreover, counsel vociferously argued for defendant's innocence in closing arguments.

¶ 57      Furthermore, Cheryl's testimony, as presented in her affidavit, would be of such little probative value that it precludes any finding of prejudice stemming from counsel's failure to call her as a witness. Her testimony that she also drove the black Corvette was duplicative of Sonja's testimony and would merely serve to rehabilitate Sonja following Poynter's impeachment. Her testimony that defendant did not check under the seat earlier that day has no bearing on whether defendant checked under the seat on any other occasion, or even put the gun there himself.

Moreover, Cheryl's testimony that Sonja told the officers at the scene that the gun was hers and that she had put the gun under the seat would directly contradict Sonja's testimony that she had not spoken to the officers at the scene. We therefore reject defendant's contention that the failure to present Cheryl's testimony undermines confidence in the jury's verdict.

¶ 58                                    2. Sonja Nesbit

¶ 59        Defendant next contends that counsel was ineffective for eliciting harmful testimony from Poynter on cross-examination upon recall by the State. Specifically, defendant argues that counsel was deficient for eliciting Poynter's observations that he had never seen Sonja drive the black Corvette and had seen her driving a different car just days before the incident.

¶ 60        While it is arguably deficient performance for defense counsel to ask a State's witness questions to which counsel does not already know the answer, the record here indicates that any prejudicial effect from counsel's line of questioning was *de minimis*. See *People v. Hale*, 2013 IL 113140, ¶ 17 (reviewing court may dispose of ineffectiveness claims on prejudice grounds without addressing counsel's performance). The evidence of defendant's knowledge of the gun, while circumstantial, was overwhelming. See *Nesbit*, 398 Ill. App. 3d at 209-11 (summarizing evidence). That defendant was alone in a small car with a gun at least partially visible creates a strong inference that defendant knew the gun to be there. That inference is further supported by the testimony of two police officers who each saw defendant reach toward the area of the gun following the car chase. Indeed, the fact that defendant fled from the police is itself evidence of consciousness of guilt. *E.g.*, *People v. Harris*, 52 Ill. 2d 558, 561 (1972). Given the weight of the evidence against defendant, counsel's brief exchange with Poynter regarding what other car Sonja drove cannot be said to undermine confidence in the conclusion that defendant knew the gun was in the car.

¶ 61                              3. Defendant's Medical Condition

¶ 62        Finally, defendant argues counsel was ineffective for failing to investigate and present evidence regarding his blood sugar levels. In his petition and in this appeal, defendant contends that his elevated blood sugar caused a "[m]ental [p]sychosis" and that his medical condition "may have caused him to crash the car, to disregard the officers' directions to exit the car, and to slump forward in the car."

¶ 63        This argument can also be disposed of on prejudice grounds. See *Hale*, 2013 IL 113140, ¶ 17. It would strain credulity to suppose that each of defendant's actions on the day of the incident stemmed from defendant's medical condition. Harrison testified that the car chase, in which defendant apparently continued to obey traffic signals, lasted between 10 and 15 minutes. Poynter described that chase as taking place at "[r]elatively slow speeds." After defendant crashed, he reached toward the area under the driver's seat and moved his hands back and forth while ignoring commands to exit the vehicle. Even if evidence of defendant's medical condition and state of mind at the time of the incident had been introduced at trial, no rational juror would accept the theory that defendant's deliberate actions, taken over the course of 10 to 15 minutes, were merely the result of high blood-sugar levels. Accordingly, the lack of such evidence does not undermine confidence in the jury's verdict.

¶ 64        In summary, each of defendant's three above claims of ineffective assistance of trial counsel fail on their merits. Given the overwhelming evidence against defendant, the minimal prejudicial effect stemming from each claim, even when considered in the aggregate, would not be enough to undermine confidence in the outcome of the trial. Accordingly, we affirm the trial court's second-stage dismissal of each of these claims.

¶ 65                                      II. Excessive Sentence

¶ 66    On appeal from the denial of his motion to reconsider sentence, defendant argues that the trial court's sentence of 23 years' imprisonment for being an armed habitual criminal was excessive. The trial court is afforded broad discretion in sentencing, and a sentence within statutory limits will not be disturbed upon review absent an abuse of discretion. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). Such deference is given to the trial court's sentencing decision because that court is in a better position to determine the appropriate punishment than a reviewing court. *People v. Cox*, 82 Ill. 2d 268, 279 (1980). A trial court abuses its discretion in sentencing where it imposes a sentence "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *People v. Stacey*, 193 Ill. 2d 203, 210 (2000).

¶ 67    The offense of being an armed habitual criminal is a Class X felony. 720 ILCS 5/24-1.7(b) (West 2006). Defendant thus faced a potential sentencing range of between 6 and 30 years' imprisonment. 730 ILCS 5/5-8-1(a)(3) (West 2006). Defendant has referred to his sentence of 23 years' imprisonment as a "high-end sentence." Of course, such a characterization is purely a matter of interpretation, and we would note that a sentence of 23 years' imprisonment, where a defendant faces a standard Class X sentencing range, could just as easily be referred to as a sentence in the middle range. In any event, it is noteworthy that the sentence defendant received is significantly removed from the maximum sentence he faced.

¶ 68    Defendant's criminal history is extensive. Aside from the three felony burglaries used as elements of defendant's conviction for being an armed habitual criminal, defendant has been convicted of five misdemeanors and 13 felonies since 1982. Two of those convictions—one misdemeanor and one felony—were for possession of weapons, that same conduct as the offense underlying defendant's conviction for being an armed habitual criminal, indicative that perhaps

the sentences imposed on those occasions were of little deterrent effect. Though defendant's record does not show a conviction between 2002 and the present one, that gap is almost wholly attributable to the fact that defendant was in prison during that period. In fact, defendant had been released on parole for less than five months when he committed the present offense. Though defendant calls attention to the fact that his longest previous sentence was nine years' imprisonment, this merely highlights the fact that the shorter sentences he received apparently had no rehabilitative or deterrent impact. Given defendant's criminal history and his apparent unwillingness to reform, the sentence imposed by the trial court is far from an abuse of discretion.

¶ 69   Defendant's argument that his extensive criminal history is mitigated by other factors is unconvincing. First, defendant argues that his conviction for being an armed habitual criminal is a status offense, and that "[h]ad he not been convicted on any prior felonies, possessed a FOID card, and possessed the gun on his own land or in his own abode or fixed place of business, he would not have been guilty of any offense at all." Defendant is undoubtedly correct that if he had done things completely differently, he would not be guilty of any offense. However, the fact remains that defendant possessed a firearm, having been convicted of felony burglary on three prior occasions. The legislature, in its sound judgment, has deemed that such conduct warrants a sentence of between 6 and 30 years' imprisonment, and the trial court imposed a sentence within that range. While defendant apparently believes that such a sentence is excessive for a status offense, his dispute is with the legislature, and not the trial court.

¶ 70   Finally, defendant argues that because his possession of the firearm was constructive, rather than actual, his offense is inherently less serious and thus deserving of a lesser sentence. Defendant has cited no authority for this proposition. More importantly, his argument defies

reason. No one could credibly argue that a felon with a weapon hidden under the seat of his car as he drives is inherently a lesser danger to society than a felon with a weapon tucked in his waistband.

¶ 71    Defendant's sentence of 23 years' imprisonment was within the statutory range for Class X offenses. Indeed, the sentence in the high-middle of the Class X range is reflective of defendant's criminal history, as well as his status on parole at the time the offense was committed. Moreover, the record gives no indication that the trial court failed to consider any relevant factors in mitigation. Therefore, we find that the trial court did not abuse its discretion in sentencing defendant. Accordingly, we affirm defendant's sentence.

¶ 72                              CONCLUSION

¶ 73    The judgment of the circuit court of Peoria County is affirmed in part, reversed in part, and remanded for further proceedings.

¶ 74    Affirmed in part and reversed in part.

¶ 75    Cause remanded.