2021 IL App (1st) 190683-U

No. 1-19-0683

Order filed May 27, 2021

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 18 CR 9376 |
| | ) | |
| RODRICK LYKE, | ) | Honorable |
| | ) | Vincent M. Gaughan, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE MARTIN delivered the judgment of the court.
Justices Lampkin and Reyes concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Defendant's conviction for unlawful use of a weapon by a felon is affirmed where the trial court did not err in denying his motion to quash arrest and suppress evidence and the evidence at trial was sufficient to establish possession.

¶ 2    Following a bench trial, defendant Rodrick Lyke was convicted of unlawful use of a weapon by a felon (UUWF) and sentenced to eight years' imprisonment. He appeals, alleging that the trial court should have granted his motion to quash arrest and suppress evidence because the police officers' searches of his person and the van from which the officers recovered the firearm

were unreasonable. He further argues that the evidence was insufficient to establish possession. We affirm.[1]

¶ 3                                    I. JURISDICTION

¶ 4    The trial court sentenced Lyke on March 13, 2019, and on that same date, Lyke filed a notice of appeal. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1980, art. VI, §6) and Illinois Supreme Court Rule 603 (eff. Feb. 6, 2013) and Rule 606 (eff. July 1, 2017), governing appeals from a final judgment of conviction in a criminal case.

¶ 5                                    II. BACKGROUND

¶ 6    Lyke was charged by indictment with 14 counts arising from an incident on June 9, 2018. The State proceeded on count I for UUWF (720 ILCS 5/24-1.1(a) (West 2018)), along with counts III and XI for aggravated unlawful use of a weapon (AUUW) (720 ILCS 5/24-1.6(a)(1) (West 2018)).

¶ 7    Prior to trial, Lyke filed a motion to quash arrest and suppress evidence, alleging that the firearm should not be introduced into evidence because its recovery resulted from an illegal search. On January 24, 2019, the trial court held both a suppression hearing and a bench trial.

¶ 8    Chicago police officer Nick Zarbock testified that on June 9, 2018, he was driving an unmarked vehicle with Officers William Hronopoulos and Baltizar[2] near Lake Street and Lotus Avenue in Chicago. At approximately 10:30 p.m., Zarbock saw a black van turn right without signaling. Zarbock made a U-turn and followed the van until it stopped on the 200 block of South

---

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

[2] Officer Baltizar's first name does not appear in the report of proceedings.

Laramie Avenue. The front seat passenger, later identified as Aaron Evans, exited the van and walked away. Zarbock activated his emergency lights, and the officers exited their vehicle and approached the van. Zarbock approached the driver's side, while Hronopoulos detained Evans. Baltizar approached "the front side of the van" and spoke to the driver through the open passenger door.

¶ 9     Initially, Zarbock only saw the driver inside the van. Baltizar instructed the driver, later identified as Antjuan Mabins, to turn off the van, and he complied. At this point, the van's interior lights activated, and Zarbock saw a man seated in a "captain's chair behind the passenger seat." He identified Lyke in court as that man. Lyke made "a furtive movement" at the "exact" time the light activated. Specifically, Lyke reached to his waistband with his left hand, arched his back, and then reached behind himself to the third row of the van. Zarbock explained that the seats in the second row of the van were isolated, while the third row consisted of a bench. He could not see anything in Lyke's hand at the time of the movements, but told Hronopoulos and Baltizar that Lyke was "reaching" or "placing something."

¶ 10     Lyke opened the van door and Hronopoulos said, "Let me see your hands." Lyke stepped out, and Baltizar and Hronopoulos detained him. At some point, Zarbock saw Hronopoulos look in the van and recover a firearm. The officers arrested Lyke, who wore a vest Zarbock believed was bullet-resistant, and transported him to the police station. At the station, Lyke said, "it's crazy out there," when the officers asked him about the vest.

¶ 11     On cross-examination, Zarbock testified that he did not activate his vehicle's emergency lights or sirens while following the van and did not attempt to curb the van. Zarbock did not see Evans do anything illegal prior to his detention. Every window on the driver's side of the van

besides the windshield was tinted, and the windows through which Zarbock saw Lyke were rolled up at the time. The van's occupants were all removed prior to Hronopoulos's search of the van, the officers did not have a warrant to search the van, and Mabins did not consent to the search. The officers cited Mabins for failure to use his turn signal.

¶ 12    Hronopoulos testified that when Mabins turned off the ignition, Hronopoulos looked inside the van and noticed Lyke, whom Hronopoulos identified in court, seated in the "rear passenger seat." Hronopoulos saw that Lyke's hands were near his waistband, and Lyke then reached over his chair. Zarbock said, "somebody is reaching behind the seat." Hronopoulos said to Lyke, "let me see your hands." At this point, Lyke exited the vehicle, and did not respond when Hronopoulos asked what he was doing. Hronopoulos and Lyke "went to the side of the vehicle," where Hronopoulos conducted a pat down, during which he noticed that Lyke wore a "hard vest like body worn armor." Following the pat down, Hronopoulos "looked inside the vehicle" and observed a firearm in the area where he saw Lyke reach. He recovered the weapon, a loaded .380-caliber Ruger handgun with a laser sight.

¶ 13    On cross-examination, Hronopoulos testified that Evans walked away from the van after it parked and did not flee from the officers. Hronopoulos did not see Evans engage in any criminal activity. Prior to the van lights activating, Hronopoulos did not know Lyke was inside, and seeing Lyke caught Hronopoulos "off guard." He never saw Lyke hold the firearm and did not know Lyke wore the vest prior to him exiting the van.

¶ 14    The State entered a certified copy of conviction for Lyke in case No. 16 CR 1773401 for the Class 4 felony of aggravated fleeing and eluding.

¶ 15    Mabins testified for the defense that he was close friends with Lyke and grew up with him. Lyke and Evans entered Mabins's van around 9:50 to 10 p.m. on June 9, 2018. Mabins used his turn signal when he turned right at the intersection of Lake and Lotus. He then drove eight blocks and stopped so Evans could exit. At no point did Mabins know there were police officers behind him. After Evans exited, a police officer opened the front passenger-side door and instructed Mabins to exit the vehicle. The officer did not tell Mabins to turn off the ignition; the van was parked and running, and Mabins never turned it off. Mabins did not know of a firearm in the vehicle, Lyke never told Mabins he had a firearm, and Mabins did not see Lyke with a firearm. The officers never showed Mabins a firearm. The van's interior lights do not illuminate automatically when the ignition is turned off. He did not consent to a search of the van.

¶ 16    On cross-examination, Mabins testified that he never saw Lyke's vest on June 9, 2018. At some point, the officers informed Mabins that they recovered a firearm from the van.

¶ 17    The State entered a stipulation that Mabins had a conviction for second degree murder in case No. 02 CR 4249.

¶ 18    In arguing the motion to quash arrest and suppress evidence, defense counsel posited that the stop, seizure, and search were all illegal. Counsel argued that the probable cause to stop the van following the failure to signal "went stale within two or three blocks" of the violation. The State argued the stop was valid, and the location in a high-crime area and the officers' observation that Lyke reached to his waistband, leaned back, and then motioned behind the seat gave the officers "probable cause that there is something in the car that's illegal *** that they have a right to search for."

¶ 19    In denying the motion, the court stated that it found the officers' testimony credible, and that the probable cause to stop the vehicle did not go "stale." The court further stated that based on Lyke's movements and their presence in a "high crime area," the officers had "enough" to search the vehicle based on *Terry v. Ohio*, 392 U.S. 1 (1968).

¶ 20    Defense counsel further argued that even if the firearm were in evidence, the record was insufficient to establish that Lyke possessed the firearm. The State responded that Lyke's movements towards the location of the firearm's recovery established constructive possession. The court found Lyke guilty on count I for UUWF and count XI for AUUW under a theory of constructive possession of the firearm.

¶ 21    At a subsequent proceeding, Lyke argued two posttrial motions, one requesting that that the court reconsider its denial of the motion to quash arrest and suppress evidence, and another for a new trial. Regarding the motion to reconsider, defense counsel argued that under *People v. Smith*, 2015 IL App (1st) 131307, a defendant's furtive movements alone cannot supply an officer probable cause to search the defendant or a vehicle in which the defendant was detained. The court denied the motion, stating that Lyke did not make only one furtive movement, but "a series of movements." The court then denied Lyke's motion for a new trial, rejecting Lyke's challenge regarding his knowledge of the firearm.

¶ 22    The court stated that it merged counts III and XI into count I, and the matter moved to sentencing.[3]

¶ 23    In aggravation, the State called Hronopoulos, who testified that he believed the vest—worn by Lyke at the time of his arrest and introduced at trial—was Kevlar. The court found that the State

_____

[3] The trial court did not make an express finding regarding count III.

had proven the vest was body armor, which per the statute rendered Lyke's UUWF conviction a Class X felony. 720 ILCS 5/24-1.1(a), (e) (West 2018). The court then sentenced Lyke to eight years' imprisonment on count I for UUWF (720 ILCS 5/24-1.1(a), (e) (West 2018)), and denied his motion to reconsider sentence.

¶ 24    On appeal, Lyke first argues that the trial court erred by denying his motion to quash arrest and suppress evidence because the searches of his person and the van were illegal.

¶ 25    A trial court's decision on a motion to quash arrest and suppress evidence is reviewed using a two-tiered standard of review, where the trial court's fact findings receive deference and will be reversed only if manifestly erroneous, but the reviewing court considers *de novo* whether the officers' conduct was legal. *People v. Holmes*, 2017 IL 120407, ¶ 9. The defendant has the burden of proof on a motion to quash arrest and suppress evidence, but if the defendant establishes a *prima facie* case that the evidence at issue was illegally obtained, the burden will shift to the State to introduce evidence to counter. *People v. Brooks*, 2017 IL 121413, ¶ 22. Throughout, the ultimate burden of proof remains on the defendant. *Id.*

¶ 26    The right to be free from unreasonable searches and seizures is guaranteed by the fourth amendment to the United States Constitution. U.S. Const., amend IV. Fourth amendment protections arise when an individual has been detained by officers, meaning a reasonable person in the individual's circumstances would not feel free to leave. *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).

¶ 27    Police officers generally must obtain a warrant to conduct a search of a person or location. *Terry*, 392 U.S. at 21. One exception to this rule is the standard established by the United States Supreme Court in *Terry*, where the Supreme Court explained that police officers may conduct an

investigative stop of an individual if they have reasonable, articulable suspicion of criminal activity, and may conduct a protective pat down of an individual during an investigative stop under circumstances where a reasonable person would believe that his safety or the safety of others was in danger. *Id.* at 21-22, 27, 30-31; see also *People v. Colyar*, 2013 IL 111835, ¶¶ 34-36. Additionally, during a *Terry* stop, officers may conduct a protective search for weapons in the passenger compartment of a vehicle where the officers have reasonable suspicion that an occupant of the vehicle may pose a danger. See *Michigan v. Long*, 463 U.S. 1032, 1049 (1983). "Whether an investigatory stop is valid is a separate question from whether a search for weapons is valid." *People v. Thomas*, 198 Ill. 2d 103, 109 (2001). The validity of investigative stops and searches under *Terry* is considered under the totality of the circumstances. *Colyar*, 2013 IL 111835, ¶ 32.

¶ 28    Because the fourth amendment is not implicated until a seizure occurs, our first inquiry is to determine when Lyke was seized. *People v. Nitz*, 371 Ill. App. 3d 747, 750 (2007). As our supreme court has explained, "[a] traffic stop is a seizure of both the driver and the passengers, analogous to a so-called *Terry* stop." *People v. Bass*, 2021 IL 125434, ¶ 15. Consequently, in the case at bar, the seizure occurred when the officers pulled behind the van, activated the police vehicle's emergency lights, stopped Evans, and approached the van while Mabins and Lyke were still inside.

¶ 29    Having determined when defendant was seized, our next inquiry is whether the officers were justified in searching Lyke's person and the van.

¶ 30    Here, the evidence showed that while on patrol, Zarbock observed Mabins's van turn right without signaling. Zarbock made a U-turn and followed the van for six blocks before it pulled over

and Evans exited. Zarbock parked the police vehicle behind the van, activated emergency lights, and Hronopoulos exited and detained Evans. Zarbock approached the driver's side door, where Baltizar was speaking with Mabins. Baltizar instructed Mabins to turn off the van. Mabins complied, at which time Zarbock and Hronopoulos stated the cabin light activated inside the van, though Mabins disputed this. Both Zarbock and Hronopoulos testified that when the lights activated, they saw Lyke in a captain's chair in the second row of the van. Lyke reached towards his waist, then reached behind him towards the van's third row bench seat. Lyke exited the van, and the officers conducted a "protective pat down," at which time they discovered Lyke wore what the officers believed was a bulletproof vest. Hronopoulos then entered the van and looked towards the area where Lyke had motioned, the third-row bench seat, where Hronopoulos observed a firearm.

¶ 31     On this record, we find the trial court did not err in denying the motion to quash arrest and suppress evidence. Lyke was detained such that his fourth amendment rights applied at the time the officers initiated the traffic stop. At this point, the officers had probable cause to believe Mabins had violated a traffic law, and thus the stop and subsequent investigation were valid. *People v. Sutton*, 2020 IL App (1st) 181616, ¶ 21 ("The seizure of a vehicle is considered reasonable and lawful where police have probable cause to believe that a traffic violation occurred."). Immediately after the officers approached Mabins and asked him to shut off the van, Zarbock and Hronopoulos observed Lyke act in a way that supplied reasonable suspicion that he was armed. Specifically, the officers both testified that Lyke reached towards his waistband, and then reached behind himself in an action that could reasonably be interpreted as an attempt to conceal the item

he removed from his waistband. Under these circumstances, a reasonable officer could believe his safety was in jeopardy and conduct a *Terry* search of Lyke's person accordingly. *Id.*

¶ 32    Lyke argues that pursuant to *Smith*, the search of his person was illegal because innocuous furtive movements are not sufficient to supply reasonable suspicion that a defendant is dangerous such that a *Terry* search is justified. In *Smith*, this court held that the defendant's movements were insufficient to supply reasonable suspicion where the officer based his search only on observing the defendant reach "towards the passenger seat." See *Smith*, 2015 IL App (1st) 131307, ¶¶ 29, 36; see also *People v. Brown*, 190 Ill. App. 3d 511, 514-16 (1989) (vague movements, including the defendant moving his hand from a vehicle's dashboard to the floor, were not enough to provide reasonable suspicion "without other facts suggesting possible danger to the officer"). Lyke's reliance on *Smith* is misplaced because Lyke's movements here—namely reaching towards his waistband, arching his back, and then reaching behind himself to another seating area of the van— could reasonably be interpreted as Lyke secreting a weapon in the vehicle, unlike the vague movements found insufficient in *Smith* and *Brown*.

¶ 33    Lyke additionally challenges the search of the van, but we find that this was also supported by reasonable suspicion. Not only did the officers see Lyke's specific movements in the van, but following the search of Lyke's person, they also discovered his vest. Under these circumstances, the officers could reasonably conclude that a *Terry* search of the van was necessary for their safety. *Long*, 463 U.S. at 1049.

¶ 34    Lyke argues that this court should reject Zarbock's and Hronopoulos's testimony regarding Lyke's furtive movements as incredible based on the window tint of the van and Mabins's testimony that the internal lights do not activate when the ignition is turned off. However, the trial

court's credibility determinations in a motion to quash arrest and suppress evidence are granted deference, and here the court expressly credited the officers' testimony. We must uphold this finding on review unless it is against the manifest weight of the evidence, which Lyke does not demonstrate here. See *People v. McDonough*, 239 Ill. 2d 260, 266 (2010). Therefore, we must accept the officers' testimony that they were able to see Lyke's movements while he was seated in the van. Based on the foregoing, the trial court did not err in denying the motion to quash arrest and suppress evidence.

¶ 35    Lyke next argues that the evidence regarding his possession of the firearm was insufficient to sustain the guilty finding.

¶ 36    On a sufficiency of the evidence challenge, we construe the evidence in the light most favorable to the State and determine whether any rational factfinder could have found the defendant guilty beyond a reasonable doubt. *People v. McLaurin*, 2020 IL 124563, ¶ 22. All reasonable inferences must be drawn in favor of the State. *People v. Newton*, 2018 IL 122958, ¶ 24. Additionally, the reviewing court may not substitute its judgment for that of the factfinder regarding the weight of the evidence or the credibility of the witnesses. *People v. Jackson*, 2020 IL 124112, ¶ 64. The decision of the lower court should not be reversed unless the evidence is so improbable or unsatisfactory that it gives rise to reasonable doubt of the defendant's guilt. *Id.*

¶ 37    As charged here, the State had to prove that Lyke knowingly possessed a firearm after having been convicted of a felony. 720 ILCS 5/24-1.1(a) (West 2018). Lyke challenges the evidence regarding his possession of the weapon. Possession can be actual or constructive. *People v. Givens*, 237 Ill. 2d 311, 335 (2010). Here, the trial court found Lyke guilty on a constructive possession theory. To demonstrate constructive possession of contraband, the State must provide

evidence that the defendant had both knowledge and control of the contraband. *People v. Hunter*, 2013 IL 114100, ¶ 19. Both may be proven through circumstantial evidence. *People v. Moore*, 2020 IL App (1st) 182535, ¶ 26.

¶ 38 To establish a defendant's control of contraband, the State must demonstrate that the defendant had the "capability and intent to maintain dominion and control over the contraband." *People v. Jackson*, 2019 IL App (1st) 161745, ¶ 27. Evidence that an item was recovered from within a defendant's reach in a vehicle may provide an inference of control. *People v. Ingram*, 389 Ill. App. 3d 897, 900 (2009) (citing *People v. O'Neal*, 35 Ill. App. 3d 89, 91 (1975)). Factors that can demonstrate whether a defendant has knowledge of a weapon in a vehicle include (1) the weapon's visibility from the defendant's position in the vehicle, (2) the length of time the defendant had to observe the weapon, (3) whether the defendant made any gestures suggesting he tried to retrieve or hide the weapon, and (4) the weapon's size. *People v. Bailey*, 333 Ill. App. 3d 888, 91-92 (2002).

¶ 39 Here, the trial court credited the officers' testimony that Lyke, while seated in the second-row captain's chair of Mabins' van, reached towards his waistband, arched his back, and reached behind him towards the third-row bench seat of the van. Hronopoulos recovered the firearm from the third-row bench seat. Mabins and Evans were never observed in the second or third rows of the van.

¶ 40 Based on this evidence and the trial court's credibility determination, we find that a rational factfinder could have found that the evidence established that Lyke constructively possessed the firearm. Citing *Bailey*, Lyke contends that mere presence in a vehicle from which a firearm is recovered is insufficient to prove control. 333 Ill. App. 3d 888. Lyke emphasizes that he did not

own the van, no forensic evidence connected him to the firearm, and the officers did not testify that they saw the firearm in Lyke's hand. This argument is unpersuasive, however, because it does not account for the officers' testimony that Lyke made specific motions towards the area where Hronopoulos recovered the firearm. A reasonable interpretation of this action is that Lyke had immediate and exclusive control of the area from which Hronopoulos recovered the contraband. Additionally, from his position in the second row of the van, Lyke had easier access to the area in which the firearm was found than the two passengers in the front of the van, permitting an inference of Lyke's immediate and exclusive control of that area. See *Ingram*, 389 Ill. App. 3d at 900.

¶ 41    Lyke further argues that the evidence was insufficient to prove knowledge because he was only in Mabins's van for a short time, the firearm was small, and he was not seated in the third row. Initially, we note that no evidence adduced at trial established the size of the weapon. Moreover, the record demonstrates that Lyke reached towards his waist, then made a movement towards the area in which the firearm was recovered. Based on this conduct, a rational factfinder could conclude that Lyke made a specific gesture indicating an effort to hide the firearm. Additionally, Hronopoulos testified that he recovered the firearm on the bench seat immediately behind Lyke. This suggests that the item was in an area that was visible to Lyke and more accessible to him than to Mabins and Evans immediately prior to its recovery. See *People v. Nesbit*, 398 Ill. App. 3d 200, 210-11 (2010); *People v. Grant*, 339 Ill. App. 3d 792, 798-99 (2003).

¶ 42    Finally, Lyke again claims that we should not credit the officers' testimony regarding his furtive movements. On sufficiency of the evidence review, we may not substitute our judgment for that of the factfinder regarding the credibility of the witnesses. *Jackson*, 2020 IL 124112, ¶ 64.

Here, the court chose to credit the officers' testimony, and Lyke does not explain why this decision was so improper that we should reverse it on appeal.

¶ 43    For the foregoing reasons, Lyke's conviction is affirmed.

¶ 44    Affirmed.