No. 3–08–0320

Filed February 11, 2010

IN THE

APPELLATE COURT OF ILLINOIS

THIRD JUDICIAL DISTRICT

A.D., 2010

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 07--CF--516 |
| JUAN TRENT NESBIT, | ) ) | Honorable Michael E. Brandt, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE WRIGHT delivered the opinion of the court:

A jury found defendant guilty of the offenses of armed habitual criminal, unlawful use of a weapon by a felon, and aggravated unlawful use of a weapon on February 7, 2008. Following the denial of defendant's motion for new trial, the trial court sentenced defendant to a 23-year term of imprisonment in the Department of Corrections for the offense of armed habitual criminal. On appeal, defendant challenges the sufficiency of the State's evidence regarding this charge. Additionally, defendant requests a new trial based on improper questioning by the prosecutor and claims he received ineffective assistance of counsel.

FACTS

On May 22, 2007, a grand jury for Peoria County, Illinois, issued a four-count bill of indictment against defendant that alleged defendant committed the offense of armed habitual criminal on May 5, 2007, in that defendant knowingly possessed a firearm, being a handgun, after having been previously convicted on at least two or more separate occasions of a forcible felony, burglary, in violation of section 24-1.7(a) of the Criminal Code of 1961 (720 ILCS 5/24-1.7(a)

(West 2006)). Count II alleged defendant committed the offense of unlawful possession of a weapon by a felon in that defendant knowingly possessed a firearm at a time when defendant was on parole or mandatory supervised release from the Illinois Department of Corrections as part of his sentence for a prior felony conviction in violation of section 24-1.1(a) of the Criminal Code of 1961 (720 ILCS 5/24-1.1(a) (West 2006)). Count III alleged defendant committed the offense of aggravated unlawful use of a weapon in that defendant knowingly possessed in a motor vehicle an uncased, loaded firearm, immediately accessible to defendant, at a time when defendant was not on his own land, abode or place of business, and defendant had been previously convicted of a felony offense in violation of section 24-1.6(a)(1) of the Criminal Code of 1961 (720 ILCS 5/24-1.6(a)(1) (West 2006)). Count IV alleged defendant committed the offense of driving while license revoked in violation of section 6-303(a) of the Illinois Vehicle Code (625 ILCS 5/6-303(a) (West 2006)).

On June 7, 2007, defendant posted bond. In a letter dated June 21, 2007, defendant advised the court that he was now in the custody of the Pinckneyville Correctional Center in Pinckneyville, Illinois. On July 3, 2007, the trial court entered an order directing the clerk of the court to forward a copy of defendant's *ex parte* communication to each of the attorneys of record. On August 3, 2007, defendant appeared in the custody of the Department of Corrections with one of the public defenders, and the trial court granted defendant's request for a continuance.

On October 26, 2007, defendant appeared before the trial court in the custody of the Department of Corrections, along with his newly retained attorney. The trial court entered an order allowing the public defender's office to withdraw and continuing defendant's jury trial to a date in February of 2008.

On February 6, 2008, the date the jury trial commenced, defendant filed an assignment of security for bail with the trial court providing defendant assigned the previously posted bond in the amount of $3,500 to his attorney of record for "value received." On that same day, February 6, 2008, the parties filed two stipulations of evidence with the court for the jury's consideration.

One stipulation provided defendant had been previously convicted on three separate occasions of the felony offense of burglary. The other stipulation provided that at the time of the alleged, new offenses on May 5, 2007, defendant was on parole for the felony offense of retail theft.

The State called Jarvis Harrison, an officer with the Peoria police department, who testified that on May 5, 2007, he received information from dispatch at approximately 8:30 p.m. of a domestic dispute indicating the suspect left the scene in a black Corvette. Thereafter, the officer saw a black Corvette, ran the license plate information, and found the plate "came back" to the same "last name of the individual that the officer was looking for." Harrison recalled that the plate came back to Sonja Nesbit.

He followed the vehicle and activated his squad car lights and siren. Harrison also testified to the events involving a police chase of the vehicle, driven by defendant, which lasted several minutes. According to the officer, the black Corvette eventually struck a high concrete curb and came to a stop. After the vehicle stopped, he and officer Poynter exited their vehicles and gave instructions to the driver to exit the car with his hands in the air. Harrison stood to the right of Poynter, approximately seven feet from the Corvette. Despite Poynter's directions to the driver of the black Corvette, the driver did not comply.

Harrison stated that he had his weapon drawn and also gave commands to the driver. At this time, he was able to observe the driver, but the driver did not try to get out of the vehicle. He observed the driver remain in the vehicle and reach toward the driver's side floorboard. Harrison described the driver reaching "back and forth with his hands."

Eventually, the driver exited the vehicle, and officer Poynter handcuffed defendant. Poynter searched the black Corvette and then advised Harrison of what had been found. Harrison then looked inside the vehicle and observed a handgun "[r]ight by the driver's seat." Harrison stated that when he looked inside the vehicle, he saw the "butt" of the gun but could not see the barrel. Harrison further stated the "butt" portion was located forward of the front of the driver's seat.

3

Rory Poynter, an officer with the Peoria police department, testified he worked on May 5, 2007. On the date, he was assigned to the Peoria Housing Authority and drove a semi-marked squad car. At approximately 8 p.m., he received information from dispatch asking officers to stop a black Corvette. Thereafter, he observed a Corvette enter the River West community "off of Jefferson." When he observed the vehicle, he also saw Officer Harrison behind the Corvette with "his red and blue lights on trying to stop the vehicle." Poynter then activated the lights on his vehicle and attempted to stop the Corvette, along with Officer Harrison. Poynter stated that the Corvette stopped "behind the 1200 block of Phoenix" when it crashed into a curb.

After the Corvette crashed, he exited his vehicle with his handgun drawn. Poynter observed that the driver of the Corvette "swung his door open." Poynter began ordering the driver out of the vehicle. He told the subject, "Exit the vehicle with your hands up." However, the subject did not comply. When asked what he observed, Poynter stated:

> "Um, I could see the driver – I was off to his left side, as I stated before. The door was open, I could see that he had one hand in the air and his right hand was not clearly visible to me. The driver continued to reach down towards the floorboard, at which time I transitioned from my handgun and attempted to tase him, which did not work."

Then, he observed the subject "put hands down towards the floorboard of the vehicle." He repeatedly told the subject to keep his hands up and exit the vehicle. Poynter observed the subject place his hands toward the floorboard again, and Poynter explained that after he attempted to tase the subject, the subject put both hands toward the floorboard.

Poynter indicated that Officer Harrison stood behind him and that other officers also arrived at the scene. At this point, the subject exited the vehicle and "laid on the ground." Poynter indicated that the driver's side air bag had deployed. Further, he did not observe any bruising or bleeding on defendant.

4

After the subject was handcuffed and taken into custody, he searched the Corvette. Poynter stated "[i]n plain view underneath the driver's seat floorboard area I located a silver 1911 style handgun." Poynter explained that he watched Lieutenant Adams clear the chamber of the weapon. Based on his observations, the weapon and the magazine were loaded.

Poynter identified several photographs, including a photograph of the vehicle at the scene of the stop, a photograph of the handgun on the floor of the vehicle as it was found, and a photograph of the handgun on the floorboard of the Corvette but not in its original location. Poynter also identified defendant in court as the driver of the black Corvette. Poynter testified that he took the handgun into evidence, and Poynter identified the handgun in court.

After Poynter identified the State's exhibits, the following series of questions and answers occurred between the prosecutor and Poynter, without objection from defense counsel:

"Q. Now after the handgun was recovered and the defendant was taken into custody, did you have occasion to speak with the defendant?

A. Yes, sir.

Q. And did you actually – did he basically offer anything or any information to you at that point?

A. Um –

Q. Did he say who the handgun belonged to?

A. No, sir, he did not."

During his testimony, Poynter agreed that the .45-caliber handgun appeared to be an older gun and that the shells within the magazine could no longer be purchased. Poynter testified that defendant's mother, Sonja Nesbit, and defendant's wife arrived at the scene. Poynter acknowledged that defendant's wife and mother picked up some items from the scene.

Scott Bowers, an officer with the Peoria police department assigned to the crime scene unit, testified that on May 5, 2007, he responded to the incident in question in order to retrieve a

5

handgun. After retrieving the handgun, he processed the handgun for any latent fingerprints. Bowers stated that "[t]here was a partial fingerprint that was on the frame of the gun." Bowers said that he was not able to make a determination from the print. As a result, he took the gun to the State Police crime lab in Morton, Illinois.

On cross-examination, he clarified that he found the partial print on the "slide above the trigger, that area of the gun." Bowers stated that he checked the shells for fingerprints but did not find any latent prints or partial prints. Bowers said that the handgun was a stainless steel gun, that the serial numbers on the gun had been defaced and that defacing had occurred some time ago because the area had rusted. Bowers also explained on redirect examination that in his experience, even though items are touched, fingerprints may not be left behind.

The State then called Sonja Nesbit to testify. She testified that on May 5, 2007, she lived at 1219 Phoenix and was home that day. Nesbit also testified that on May 5, 2007, the black Corvette was registered in her name. She identified defendant as her son, who lived on University with his wife, Cheryl, on the date in question. When asked who drove the black Corvette, she stated, "I did and Cheryl did; and Juan [defendant] did, too." She stated that she and Cheryl both drove the vehicle on May 4, 2007. Nesbit testified that she knew her son drove the vehicle on May 5, 2007.

When asked what she did at the scene of the accident, she stated, "I was trying to get all the stuff out of the car because the car had already been crashed into and they were towing the car away, so I was trying to get all of my stuff out of the car." Nesbit could not recall anyone speaking to her or asking her questions. However, she acknowledged that someone might have asked her "if it was mine" but could not recall any other questions. She denied being asked who typically drove the vehicle and went on to state, "I don't recall them asking me anything." When asked if she told Officer Poynter, "I pay for it but Juan [defendant] is the only one who drives it," Nesbit stated, "No, I didn't say that." When asked by the prosecutor how she could be so sure about her answer when she did not even recall the conversation with the officer, she stated, "But I

6

don't say he's the only one that drives it when I drive it and Cheryl drives it."

Nesbit stated that she owned a ".45" gun on May 5, 2007, and that the gun was located "up underneath the front seat." She stated that she "put it there." According to Nesbit, her husband originally owned the gun. Nesbit stated that she signed an affidavit in May 2007 stating the car belonged to her; the gun belonged to her; the gun was located underneath the seat; and defendant did not know the gun was in the car. To her knowledge, the affidavit was given to the State's Attorney office.

The State then recalled Officer Poynter to the stand. Poynter stated that while at the scene of the accident, he spoke with Sonja Nesbit. He identified her as the woman who just left the courtroom. Poynter explained that he questioned her about who drove the black Corvette. The prosecutor then asked, "And did she answer that she paid for it but Juan is the only one who drives it." Poynter responded, "Correct."

Poynter acknowledged knowing Nesbit on the date in question in that he had seen her on prior occasions. He denied ever seeing Nesbit driving the black Corvette, and he denied ever seeing the black Corvette parked at her residence. Poynter stated that he saw Nesbit driving a Mitsubishi Eclipse just days prior to the incident. When asked by defense counsel if Nesbit told him that she owned the car, Poynter stated, "Correct." When asked if Nesbit told him that "Juan mostly drives the car," Poynter stated, "Yes, sir." Nesbit also told him that the personal property in the vehicle belonged to her. Poynter also acknowledged that he discussed the gun with Nesbit. He could recall whether Nesbit advised him that she owned the gun or stated that she had a firearm owners identification card.

On redirect examination, the prosecutor asked "did Sonja say that Juan mostly the [*sic*] drives the car or did she say that Juan is the only one what [*sic*] drives the car?" In response, Poynter testified, "She stated Juan is the only one that drives the car." At that time, the State indicated that it did not have any other witnesses, and the trial court adjourned for the day.

On February 7, 2008, the State presented another stipulation to the jury. The stipulation

provided that if Linda Yborra testified, she would state as follows:

> "That she is a firearms examiner for the Illinois State Police
> Division of Forensic Science; that pursuant to her duties she
> examined the items packaged in People's Exhibit No. 4; that she
> found that the firearm packaged in People's Exhibit No. 4 was in
> firing condition."

After the State presented the stipulation, the State rested. The defense did not offer any evidence, and defendant chose not to testify.

The jury found defendant guilty of all pending charges in the indictment. The trial court revoked defendant's bond and scheduled a hearing on posttrial motions for April 18, 2008.

On February 12, 2008, defense counsel filed a motion for judgment of acquittal or in the alternative for a new trial. Defense counsel alleged that the trial court erred in denying defendant's motion for judgment of acquittal at the end of the State's case and at the end of defendant's case in chief, that the State failed to prove defendant guilty beyond a reasonable doubt and that the interests of justice would best be served if the trial court allowed the motion. On March 14, 2008, defense counsel filed an amended motion for judgment of acquittal or in the alternative for a new trial which claimed the same errors along with a new allegation that the trial court erred in denying defendant's motion for continuance.

On May 2, 2008, the trial court denied defendant's posttrial motion. Thereafter, the trial court sentenced defendant on count I only, armed habitual criminal, to a term of 23 years imprisonment in the Department of Corrections. Neither defense counsel nor defendant addressed pretrial detention credit toward his sentence.

The trial court entered a written order specifying defendant's credit for the days he was subject to pretrial incarceration were from May 6, 2007, until June 7, 2007, and from February 7, 2008, until May 2, 2008. Pursuant to the court's order, the clerk filed a notice of appeal on defendant's behalf on May 2, 2008.

8

ANALYSIS

On appeal, defendant raises three claims of error. First, defendant argues the State failed to prove defendant guilty beyond a reasonable doubt of the offense of armed habitual criminal. Second, defendant argues the State committed plain error when the prosecutor elicited testimony regarding defendant's postarrest silence. Finally, defendant claims defense counsel ineffectively failed to maximize the number of days the court credited toward defendant's sentence for pretrial detention.

The State argues the evidence established defendant's guilt beyond a reasonable doubt. The State submits defendant waived any error regarding postarrest silence. Alternatively, the State argues the prosecutor's questioning did not amount to plain error justifying reversal of defendant's conviction. Finally, the State argues the record is insufficient to establish counsel's ineffectiveness.

I. Sufficiency of the Evidence

The jury found defendant guilty of the offenses of armed habitual criminal, unlawful use of a weapon by a felon, and aggravated unlawful use of a weapon. However, defendant only challenges his conviction for the offense of armed habitual criminal based on the insufficiency of the State's evidence.

When reviewing a challenge to the sufficiency of the evidence, the appropriate standard of review is whether viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense were proven beyond a reasonable doubt. *People v. Pollock*, 202 Ill. 2d 189, 217 (2002), citing *Jackson v. Virginia,* 443 U.S. 307, 318-19, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2788-89, (1979); *People v. Collins*, 106 Ill. 2d 237, 261 (1985). "The same standard of review applies when reviewing the sufficiency of evidence in all criminal cases, regardless of whether the evidence is direct or circumstantial." *People v. Pollock*, 202 Ill. 2d at 217. Circumstantial evidence alone is sufficient to sustain a conviction where it satisfies proof beyond a reasonable doubt of the elements of the crime

charged. *People v. Pollock,* 202 Ill. 2d at 217. Decisions regarding the credibility of witnesses and the weight given to their testimony are exclusively within the province of the jury. *People v. Collins*, 106 Ill. 2d at 261-62.

A defendant's criminal conviction will be reversed only where the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of defendant's guilt. *People v. Wheeler*, 226 Ill. 2d 92, 115 (2007), citing *People v. Smith,* 185 Ill. 2d 532, 542 (1999); *People v. Pollock*, 202 Ill. 2d at 217; *People v. Collins*, 106 Ill. 2d at 261. A reviewing court should not retry a defendant when considering a sufficiency of the evidence challenge. *People v. Wheeler*, 226 Ill. 2d at 114.

The Criminal Code of 1961 provides that a person commits the offense of being an armed habitual criminal when that person "receives, sells, possesses, or transfers any firearm" after previously having been convicted for two or more forcible felony offenses identified by statute. 720 ILCS 5/24-1.7 (West 2006). At trial, defendant stipulated that he had three separate felony convictions for the offense of burglary, a forcible felony. Further, defendant concedes on appeal that he drove a motor vehicle which contained a handgun. However, defendant contends that the State failed to prove that he knowingly possessed the handgun that the police discovered in the motor vehicle he admitted driving.

Criminal possession may be actual or constructive. Where the possession is constructive, the State must prove that "defendant (1) had knowledge of the presence of the weapon, and (2) had immediate and exclusive control over the area where the weapon was found." *People v. Ingram*, 389 Ill. App. 3d 897, 899-900 (2009), citing *People v. Hampton,* 358 Ill. App. 3d 1029, 1031 (2005); *People v. Stack,* 244 Ill. App. 3d 393, 398 (1993).

However, the State cannot rely on an inference of knowledge from defendant's presence in a motor vehicle where a weapon is found. The State must present other evidence establishing defendant's knowledge of the weapon. *People v. Ingram*, 389 Ill. App. 3d at 900; *People v. Hampton,* 358 Ill. App. 3d at 1033. Knowledge may be "inferred from several factors, including:

10

(1) the visibility of the weapon from defendant's location in the vehicle, (2) the amount of time in which defendant had an opportunity to observe the weapon, (3) gestures or movements made by defendant that would suggest an effort to retrieve or conceal the weapon, and (4) the size of the weapon." *People v. Ingram*, 389 Ill. App. 3d at 900, citing *People v. Hampton,* 358 Ill. App. 3d at 1033; *People v. Bailey,* 333 Ill. App. 3d 888, 891-92 (2002).

In this case, the State presented testimony from the officers who approached the vehicle after the black Corvette stopped. Poynter and Harrison gave directions to the driver of the black Corvette, but the driver did not comply. Then, Harrison observed defendant, who remained seated behind the wheel, reach toward the driver's side floorboard. Harrison described the driver reaching "back and forth with his hands."

Another officer, Poynter, observed that the driver of the Corvette "swung his door open." Poynter also began ordering the driver out of the vehicle. He told the subject, "Exit the vehicle with your hands up." Similarly, defendant ignored the directives of the officer and did not comply. When asked what he observed, Poynter stated:

> "Um, I could see the driver – I was off to his left side, as I stated
>
> before. The door was open, I could see that he had one hand in the
>
> air and his right hand was not clearly visible to me. The driver
>
> continued to reach down towards the floorboard, at which time I
>
> transitioned from my handgun and attempted to tase him, which did
>
> not work."

Then, he observed the subject "put [has] hands down towards the floorboard of the vehicle." Poynter saw the subject place his hands toward the floorboard again. Poynter stated that when he observed defendant reach toward the floorboard, defendant would have been reaching in the same location as the handgun.

When searching the vehicle, both Harrison and Poynter observed a handgun on the driver's side floorboard. The jury received photographic evidence depicting a standard size

11

handgun located with the handle or "butt" of the gun visible and protruding from beneath the driver's seat of the Corvette. According to the officer's testimony, the officers located the handgun in the immediate area below defendant's seat. Harrison described the handgun as being located "[r]ight by the driver's seat." He further stated that the "butt" of the gun was located forward of the front of the seat. Poynter stated "[i]n plain view underneath the driver's seat floorboard area I located a silver 1911 style handgun." Poynter testified the gun was loaded.

The officers testified defendant was the sole occupant and driver of the black Corvette. The officer's testimony provided the jury with direct evidence of defendant being located in close proximity to the weapon and circumstantial evidence of defendant arguably attempting to retrieve, conceal, or discard the weapon as officers were in pursuit and later approached the stopped vehicle.

On the other hand, the defense offered circumstantial evidence that defendant did not have knowledge the Corvette contained a loaded weapon. Sonja Nesbit, defendant's mother, testified she owned the .45-caliber gun located in the vehicle. She informed the jury that she owned the car and placed the gun underneath the front seat of the vehicle. Further, she advised the jurors that defendant did not know the gun was in the car.

The jury was required to resolve the question of fact regarding defendant's knowledge and possession of the weapon. Viewing the evidence in the light most favorable to the prosecution, we conclude a rational trier of fact could find defendant had actual knowledge of the presence of the loaded weapon and either constructively or actually possessed the gun on the day in question based on the circumstances described by the officers. Accordingly, we conclude the State proved defendant guilty beyond a reasonable doubt of the offense of armed habitual criminal.

II. Prosecutor's Questions Regarding Defendant's PostArrest Silence

Next, defendant argues the prosecutor improperly elicited testimony regarding defendant's postarrest silence warranting a new trial in this case. The State submits defendant waived any prosecutorial error regarding postarrest silence and, alternatively, asserts the

12

prosecutor's questions at issue did not amount to plain error justifying reversal of defendant's conviction.

It is undisputed that during the State's case in chief, this exchange occurred between the prosecutor and officer Poynter of the Peoria police department:

"Q. Now after the handgun was recovered and the defendant was taken into custody, did you have occasion to speak with the defendant?

A. Yes, sir.

Q. And did you actually – did he basically offer anything or any information to you at that point?

A. Um –

Q. Did he say who the handgun belonged to?

A. No, sir, he did not."

Defense counsel did not object to this line of questioning during trial. Additionally, defense counsel did not include this issue in defendant's posttrial motion.

As a general rule, a defendant's failure to object at trial or raise the issue in a written, posttrial motion results in waiver of that issue on appeal. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). An exception to the waiver rule exists in cases of plain error. *People v. Enoch*, 122 Ill. 2d at 190-91.

The first step in considering plain error is to determine whether an error occurred. An unpreserved error will not be noticed under Rule 615(a) (134 Ill. 2d R. 615(a)) unless it is clear or obvious. *People v. Piatkowski,* 225 Ill. 2d 551, 565 n.2 (2007), citing *United States v. Olano,* 507 U.S. 725, 734, 123 L. Ed. 2d 508, 519, 113 S. Ct. 1770, 1777 (1993).

If such an error occurred, a reviewing court will grant relief in either of two circumstances: (1) if the evidence is so closely balanced that the error alone threatened to tip the scales of justice or (2) if the error is so serious that it affected the fairness of a defendant's trial

13

and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Piatkowski,* 225 Ill.2d at 565. A defendant bears the burden on both the threshold question of plain error and the question whether he is entitled to relief as a result of the unpreserved error. *People v. Piatkowski,* 225 Ill.2d at 565, citing *People v. Herron,* 215 Ill. 2d 167, 186-87 (2005).

The United States Supreme Court in *Doyle v. Ohio*, 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (1976), held the State's use of a defendant's silence, at the time of arrest and after receiving Miranda warnings, for impeachment purposes violated the Due Process Clause of the fourteenth amendment. *Doyle v. Ohio*, 426 U.S. at 619, 49 L. Ed. 2d at 98, 96 S. Ct. At 2245. Subsequent to the United States Supreme Court rulings, our supreme court ruled that "[p]rosecutorial questions and remarks concerning a defendant's post-arrest silence are generally improper [citation] with exception being made for impeaching the defendant's testimony with a prior inconsistent statement." *People v. Pegram*, 124 Ill. 2d 166, 176 (1988), citing *Doyle v. Ohio*, 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (1976). Further, Illinois courts have consistently ruled that the State is prohibited from questioning or commenting on a defendant's postarrest silence without reference to whether the silence occurred before or after *Miranda* warnings unless the questioning is used to impeach defendant's testimony. *People v. Strong*, 215 Ill. App. 3d 484, 488 (1991); See *People v. Pegram,* 124 Ill. 2d at 175-76; *People v. Turner*, 128 Ill. 2d 540, 563-64 (1989); *People v. Johnson*, 170 Ill. App. 3d 828, 834 (1988); *People v. Nolan*, 152 Ill. App. 3d 260, 267-68 (1987); *People v. McMullin*, 138 Ill. App. 3d 872, 876-77 (1985).

Given that defendant did not testify in this case, the questions by the prosecutor were not offered for purposes of impeachment. Moreover, the prosecutor's inquiry improperly focused the jury on defendant's silence and attempted to imply knowledge of the handgun because defendant did not offer any assertion to the police denying or assigning ownership of the handgun to another person. Accordingly, the prosecutor's questioning was improper.

Having determined that an error occurred, this court must next apply the first prong of a

plain error analysis to determine whether the evidence was so closely balanced in this case that the error alone threatened to tip the scales of justice. *People v. Piatkowski,* 225 Ill.2d at 565. It is true that defendant did not admit to any knowledge of the handgun in the vehicle. Furthermore, defendant's mother, Sonia Nesbit, testified that she owned the handgun, owned the vehicle in which the handgun was found and placed the loaded handgun in the vehicle without defendant's knowledge. However, disputed facts do not mean the evidence was closely balanced.

It was undisputed defendant was the sole occupant of a small car, a Corvette. The gun was loaded. The gun was visible to the police officers once the car stopped. The defendant's gestures and movements were consistent with an attempt to conceal or retrieve the weapon. The jury was free to reject the testimony of Sonja Nesbit, defendant's mother, based upon credibility issues. Accordingly, we do not find the evidence closely balanced, and we do not find the prosecutor's direct examination regarding defendant's postarrest silence warrants a reversal of defendant's conviction.

Next, we consider the second prong of plain error. The second prong of the plain error rule applies if "the error is so fundamental to the integrity of the judicial process and so prejudicial to the defendant that the trial court could not cure the error by sustaining an objection or instructing the jury to disregard the error." *People v. Herrett*, 137 Ill. 2d 195, 215 (1990), citing *People v. Carlson*, 79 Ill. 2d 564, 577 (1980).

Our supreme court has held that "a comment upon a defendant's post-arrest silence, while improper, is not an error of such magnitude as to clearly deprive the defendant of a fair trial." *People v. Herrett*, 137 Ill. 2d at 215, citing *People v. Stewart*, 104 Ill. 2d 463, 488 (1984); *People v. Lucas*, 88 Ill. 2d 245, 252 (1981). Further, the prosecutor's inquiry in this case was limited. The prosecution did not argue that defendant's failure to deny ownership or proclaim his mother's ownership interest in the gun should be considered by the jury. Therefore, we cannot agree with defendant's assertion that the prosecutor's improper but limited questioning warrants a reversal of defendant's conviction in this case.

15

III.  Ineffective Assistance of Counsel

Finally, defendant claims the public defender, rather than private counsel, failed to maximize the number of days the court credited defendant toward his sentence for pretrial detention.  Defendant claims that the public defender was ineffective for failing to request the court to allow defendant to surrender the bond posted in this case, once taken into custody by the Department of Corrections for a parole violation based on this incident.

It is well established that a claim of ineffective assistance has two components.  The United States Supreme Court has stated:

> "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland v. Washington*, 466 U.S. 668, 687, 80 L. Ed. 2d 674,693, 104 S. Ct. 2052, 2064 (1984).

From the record, it is clear that defendant posted bail in the amount of $3,500 and was released from the custody of the Peoria County jail on June 7, 2007.  It is also clear from the record that on July 3, 2007, the court received a letter from defendant dated June 21, 2007.  In this letter, defendant advised the court that he was now in the custody of the Illinois Department of Corrections at the Pinckneyville Correctional Center located in Pinckneyville, Illinois.  On that same day, July 3, 2007, the trial court entered an order directing the clerk of the court to forward

16

a copy of defendant's *ex parte* communication to each of the attorneys of record.

It would be improper to find appointed counsel to be ineffective on a date *before* appointed counsel received notice of his client's incarceration for a violation of his mandatory supervised release. While the court directed the clerk to forward defendant's letter to counsel on July 3, 2007, we cannot determine when appointed counsel received the letter or had the first opportunity to discuss a potential decision to surrender bond with his client. It is clear from the record that on August 3, 2007, defendant appeared together with his appointed counsel before the circuit court in Peoria while he was in the custody of the Department of Corrections. This may have been counsel's first opportunity to discuss the matter with his client.

On October 26, 2007, the court allowed the public defender to withdraw. On that date, defendant appeared before the trial court in the custody of the Department of Corrections with his newly retained attorney. Similarly, private counsel did not request the bail money to be released on that date so that defendant could surrender himself into the custody of the county and maximize his pretrial detention credit. Apparently, defendant continued to be housed in the Department of Corrections until the date of trial. On February 6, 2008, the date the jury trial commenced, defendant filed an assignment of security for bail with the trial court providing defendant assigned the previously posted bond in the amount of $3,500 to his attorney of record for "value received."

The record is also silent as to whether appointed counsel or private counsel discussed surrendering the bond with defendant. Perhaps, defendant preferred to remain in the Department of Corrections rather than the county jail for reasons unknown. It is also plausible that defendant and counsel discussed that, without a surrender, the posted funds would be available in the future for assignment to private counsel for legal services rendered.

Based upon the record provided on appeal, there are simply too many unanswered questions. Defendant bears the burden of providing a record sufficient for this court to decide the issues before us. *People v. Jenkins*, 383 Ill. App. 3d 978, 989 (2008), citing *Foutch v. O'Bryant*,

99 Ill. 2d 389, 391-92 (1984).  Based on this record, we are unable to resolve the ineffective assistance of counsel claim without some degree of speculation.  Defendant's claim would best be presented as a postconviction matter where an adequate record can be developed.

CONCLUSION

The judgment of the circuit court of Peoria County is affirmed.

Affirmed.

SCHMIDT, J., concurs.

JUSTICE O'BRIEN, concurring in part and dissenting in part:

I respectfully dissent from the majority's holding that it was not ineffective assistance of counsel when Nesbit's attorney failed to surrender his bond in order to obtain presentence incarceration credit for him in the event he was found guilty following trial or even if he had ultimately decided to enter a plea of guilty.

The right to receive presentence incarceration credit is automatic provided that the defendant surrenders his bond.  *People v. Hatchett*, 203 Ill. App. 3d 989, 991, 560 N.E.2d 1347, 1348 (1990) (trial court erred in denying without reason defendant's motion to withdraw his bond).  Had his attorney surrendered his bond, Nesbit would have been in simultaneous custody and received credit for the time after his re-arrest.  *People v. Arnhold*, 115 Ill. 2d 379, 383, 504 N.E.2d 100, 101 (1987) (defendant who is out on bond and arrested and returned to custody on a separate charge is not returned to custody on the initial charge until his bond is revoked); *People v. Robinson*, 172 Ill. 2d 452, 459, 667 N.E.2d 1305, 1308 (1996) (defendant entitled to credit for time in simultaneous custody on different charges).

The attorney for the defendant has the responsibility for zealously representing his client, which includes procedural, tactical, and technical aspects of a defendant's defense.  While it may have been an oversight on the part of defense counsel in the instant case, the oversight was procedural in nature and caused Nesbit a further loss of liberty occasioned by his attorney's mistake.  In my opinion, such a failure to act on behalf of the defendant, when to do so would have reaped an automatic benefit, was ineffective assistance of counsel pursuant to *Strickland*.

I further believe the proper remedy is to remand this matter to the trial court to determine the proper number of credit days to which Nesbit is entitled. I believe under the instant facts, the record is sufficient to support Nesbit's claim of ineffective assistance; the only issue unresolved is the number of days for which Nesbit should receive credit for pre-sentence incarceration. *People v. DuPree*, 353 Ill. App. 3d 1037, 1049, 820 N.E.2d 560, 570 (2004) (cause remanded to amend the mittimus to reflect additional in-custody credit where defense counsel failed to surrender defendant's bond after his re-arrest). On remand, Nesbit should be given credit for the additional time he spent in custody after his re-arrest.

I concur in the majority opinion in all other respects.