2024 IL App (1st) 11545-U

No. 1-21-1545

Order filed March 28, 2024.

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).
_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 2016 CR 0920902 |
| | ) | |
| FLOYD BELL, | ) | The Honorable |
| | ) | Patrick Coughlin, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE LAVIN delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Pucinski concurred in the judgment.

ORDER

¶ 1     *Held*: The evidence was sufficient to find defendant guilty of armed robbery by accountability beyond a reasonable doubt, and the trial court did not abuse its discretion in sentencing defendant to a 33-year term of imprisonment. This court affirmed the decision of the trial court.

¶ 2     Following a jury trial, defendant Floyd Bell was found guilty by accountability of armed robbery and was sentenced to 33 years' imprisonment. On appeal, he challenges the sufficiency of the evidence to support his conviction beyond a reasonable doubt, contending the State's

occurrence witness was biased and falsely implicated him in the crime, and his inculpatory statement was incredible and therefore invalid. Defendant also contends his 33-year sentence is excessive. We affirm.

¶ 3                                    BACKGROUND

¶ 4      Defendant was arrested and charged with the aforementioned offense, along with felony murder, after a group of men robbed a Boost Mobile telephone store (Boost) in South Holland, on 162nd Street, and murdered one of the store's clients around 2 p.m. on May 17, 2016. Police traced the crime back to defendant, then age 24. The State theorized that although defendant did not enter the store, he was the master-mind behind the armed robbery because he had dated the store clerk, Imani Williams (formerly Smith), and had visited the store where she usually worked alone prior to the hold-up, essentially casing the store. The State presented evidence that, in addition to conveying details of the store's layout to his accomplices, defendant also served as the getaway driver and received portions of the armed robbery proceeds.

¶ 5                              *The Criminal Offenses*

¶ 6      In particular, the evidence at trial showed that on the day in question, defendant drove in a vehicle with his brothers, Deangelo Parker, Cornelius Bell, and an acquaintance, John Carter, to Boost. Once at the store, defendant remained in the vehicle. Parker, who was armed and wearing a white ski mask covering his face, along with Carter, entered the store and ordered the three occupants, consisting of Gail Norfleet, her boyfriend Christopher Lloyd, and Boost store clerk, Williams, to put their hands up. According to Norfleet, prior to that, she had been simply shopping for a new phone. Norfleet was ordered to empty her purse, and the unarmed man (later understood to be Carter) ordered the store clerk Williams to open the register, containing almost

2

$200. Carter took the money out of the register and then asked if there was also a safe. Williams responded that it was in the back.

¶ 7    Carter ordered Williams and customers Norfleet and Lloyd to walk inside the room where the safe was located; Parker, still armed, followed behind the group. Norfleet and Williams walked inside, while Lloyd stood just outside with Parker directly behind him. Carter and Parker demanded the password to the safe and tried it several times, but it did not work. Lloyd pled with Williams to open the safe, but he then turned around and grabbed Parker. They began to "tussle" and fell out of view. Carter went to help, while Norfleet locked the door to the safe room, and she and Williams then hid in a utility closet. Norfleet heard Lloyd "asking them not to - - to shoot."

¶ 8    Norfleet heard two shots, and the gunman order Lloyd to get on the ground if he wanted to live. Lloyd agreed and then it went quiet. Norfleet heard the back door chime, as if someone had left the store, so she opened the safe room door, but observed Parker still standing over Lloyd, who was on the floor. She slowly closed the door, and the women returned to the utility closet. Norfleet heard the front doorbell and Williams' friend calling her name. The door chimed again, and Norfleet could hear what she believed were Parker's footsteps inside the safe room again. He then left, and the back door chimed. Meanwhile, Lloyd was moaning.

¶ 9    Eventually, Norfleet and Williams emerged when the offenders had left. Norfleet ran to Lloyd, who was lying on the floor beaten and shot, and she screamed to call the police. A 911 call reporting a robbery at Boost was made at 2:04 p.m. Lloyd subsequently died from the gunshot wound to his abdomen and cardiac arrest before even arriving at the hospital.

¶ 10    Williams' testimony about the incident was largely the same as Norfleet's, delineated above, only she stated that Parker initially had his mask rolled up, so she could see his face. He

3

pulled it down as he took out the gun. She also testified that initially she and Carter were the only two in the safe room, with the others standing at the doorway. She added that following the tussle between Parker and Lloyd she heard one of the robbers say words to the effect that, "You're going to die trying to be a hero today, you're going to get shot trying to be a hero today." She also heard two shots and then the alarm, signaling first that the front door and then that the back door was being opened. In addition, Williams testified that Kiara Stallworth, Williams' friend, came in the front door inquiring about what was happening, and it was then that Williams felt safe enough to emerge from the closet. Lloyd was on the ground, and Norfleet leaned down next to him and was crying. Williams then called the police, and they arrived within minutes.

¶ 11    Williams' testimony on direct and cross-examination further revealed that she went to the police station immediately after the robbery and again two days later (on May 19), reporting that the gunman looked familiar and Williams "recognized him," but she did not recall who he was. During the second interview, an investigator mentioned defendant's name, and Williams "immediately knew that he had to have something to do with" the incident. She had known defendant over a year before the robbery. They were "really close" and had been in "somewhat" of a dating relationship, which was admittedly sexual in nature. It dawned on Williams that defendant's brother, Parker, was one of the robbers and the gunman. Williams had met Parker once at a family gathering of defendant's; in addition, she had met Cornelius several times (although she did not see Cornelius the day of the robbery).

¶ 12    Williams subsequently identified Parker in a police lineup as the robber with the gun, and she also identified defendant from a photo presented to her by investigators and then in court at trial. Norfleet identified Carter from a photo line-up. Norfleet did not see defendant inside the

store. At trial, both Williams and Norfleet identified the ski mask, an exhibit, that Parker wore during the robbery.

¶ 13 Williams further testified that the week before the robbery, defendant spent the night with Williams and went with her to her workplace at Boost the next morning (he had been to the store five or six times before). He was with her almost her entire work day, and during that time, Williams and defendant went to the back of the store where the safe was located. On cross, however, she admitted that he never asked about the safe, its code, security cameras and guards (although, neither was visible in the store), or how much she kept in the register. Williams testified she and defendant then argued later that night because another woman picked defendant up from the store, and as a result, around May 14 (three days before the robbery), Williams ruined defendant's clothes that he'd left behind. She gave them to him before the offenses in question but stated she did not see defendant on the day of the robbery. On redirect, Williams stated that on May 17, she posted on social media that her store had been robbed, and defendant called her that night to ask what happened and if she was okay, reporting that he had seen her post.

¶ 14                                        *The Investigation & Videotaped Admissions*

¶ 15 Police subsequently responded to the armed robbery and shooting on May 17, 2016, learning that the offenders had exited the back of the store. In the neighborhood behind the store, they saw a man later identified as Parker behind a tree in a yard. He was sweating and out of breath with what appeared to be blood stains on his pants. Police exited their vehicle, and attempted to address Parker, but he ran. However, shortly thereafter, police detained Parker and brought him to the station, within a mere 10 minutes of first learning about the offense.

¶ 16    Based on subsequent interviews with Parker, police began searching for the vehicle used in the hold-up and murder, a white Lincoln with Utah registration in Parker's name. They were also searching for the other suspects, defendant and Carter. Police learned that the suspects and vehicle possibly could be found at 10815 S. Hoxie in Chicago. Therefore, the day after the murder, on May 18, a surveillance team proceeded to that location, observing Cornelius step out of 10815 S. Hoxie. He looked up and down the block and returned.[1] Defendant then exited that same residence and drove away in the suspect vehicle. Defendant was stopped, arrested and taken into custody.

¶ 17    Following *Mirandized* warnings, police interviewed defendant around 4 p.m. on May 18, 2016, for 45 minutes to an hour. Defendant initially denied any involvement in the offenses but began admitting certain information. Defendant was then taken back to his lockup cell. Police conducted a quick interview around 6:45 p.m., but soon thereafter discovered that the recording equipment had quit working at some point during the first interview (about the last 10 to 20 minutes was missing).[2] Incidentally, it was during this point when the video quit working that defendant began to admit information. The police created a memo regarding the failed recording. As a result, police reinterviewed defendant around 11:30 p.m. in a different room with working equipment following another set of *Miranda* warnings, and then again on May 19, 2016.

¶ 18    During the course of the interviews, defendant admitted that he and Parker had planned the armed robbery in advance and obtained a gun for that purpose. Defendant stated he had been

---

[1]Cornelius was arrested and admitted to being in the white Lincoln during the robbery and to also receiving funds from the robbery, but he was not charged. He was also subsequently murdered. Cornelius positively identified Carter.

[2]The State presented evidence that defendant identified a photo of Carter (whom he referred to as "Lee John"). Defendant stated that Carter had ridden with them and then went into Boost with his brother to rob the store. During his interview with police, defendant stated that Cornelius had not been inside Boost. Further, the charges against Carter were ultimately dismissed.

inside the store several times with Williams and knew the store's layout. Beforehand, defendant and Parker discussed how the store was set up, and defendant told Parker he did not remember seeing any cameras. Defendant admitted that after they stopped at the gas station, he rode along with Cornelius, Carter and Parker to Boost; on the way there, Carter asked about the safe and discussed the logistics of the armed robbery. Then, Carter and Parker both went inside Boost with the intent of committing the armed robbery. Additionally, defendant knew the gun was inside a Wilson tennis bag (later determined to be the Babolat brand), which Parker carried inside the store. Defendant could not go inside because he knew Williams, and he had recently spent the night with her. Defendant, however, advised his cooffenders not to hurt Williams or do anything while customers were inside the store. Defendant stated that he and his criminal cohort had agreed that if the police came to Boost, they would leave. After Parker and Carter went inside, defendant got into the driver's seat of the vehicle.

¶ 19    Following the offenses, Carter ran out of the store, entered the vehicle with defendant, and they drove off looking for Parker for some 30 to 45 minutes. Carter described the armed robbery to defendant and also had money with him. Parker called defendant several times, but they could not find him, and so they left the neighborhood when they saw police. They (minus Parker) then returned to defendant's home at Hoxie. Defendant thus admitted being inside the vehicle before, during, and after the offenses. Defendant also received the proceeds of the armed robbery.

¶ 20    Following the interviews, defendant made calls from his jail cell, which were recorded and published to the jury. Defendant stated, "We ain't do no first degree murder," and that "none of this was supposed to happen." He further stated that he "should have stayed home," and that

he told the police about "the ride" and that he "was in the car." He added that "there's some time [that's] gonna be done."

¶ 21    An officially sanctioned police search later ensued at and around 917 East 161st Place, which was within walking distance from Boost. At the outside trash bin, police recovered a Babolat tennis racquet with stains on the case cover. Inside the case was a gray sweatshirt with blood-like stains and a .40 caliber HiPoint firearm, loaded with six bullets, that had apparent blood stains on it, in addition to a cell phone. The firearm was swabbed for DNA.

¶ 22    In the customer area of Boost, police recovered a cash register containing only loose change (totaling $4.85). In the storage area, they recovered a cut-up, bloody gray sweatshirt bearing apparent blood splatters on the cuff consistent with a close-range shooting, and a white t-shirt with a hole in it consistent with a fired bullet entering through it. Police further recovered from the storage area two gold-colored .40 Tulammo Smith & Wesson spent shell casings; an unfired bullet of the same type; and a white ski mask, swabbed for DNA. There were several holes in the wall with projectile fragments from a firearm discharge, along with similar fragments on the floor. Just outside the storage room was a clump of hair with blood-like stains on it. The items were inventoried. Forensic evidence showed that the fired cartridge casings and an unfired cartridge case found at Boost did indeed come from the firearm found at 917 161st Place (a HiPoint JCP, 40 Smith & Wesson firearm in proper working condition), as did one bullet that entered Lloyd, which was recovered during the autopsy.

¶ 23    The parties then stipulated to the following forensic evidence. Parker was a possible donor of the major DNA profile identified on the white facial mask, which had been swabbed for DNA; Lloyd and Carter were excluded. Lloyd was included as a donor of the DNA found on the firearm and its components, which had also been swabbed for DNA; Carter was excluded. Lloyd

was included as a donor of additional male DNA found on Parker's fingers; Carter was excluded. Oral swabs, hair, and fingernail specimens were collected from Lloyd. Parker was included as a donor of the minor DNA profile found on the right fingernails of Lloyd; Carter was excluded.

¶ 24    In addition, police collected video surveillance with time stamps around the time of the offenses (which occurred about 2 p.m.) from various businesses within a quarter mile, a half block, and around the corner from Boost, depicting a vehicle consistent with the White Lincoln bearing Utah plates. The surveillance video from the business right next to Boost depicted the victim and two other subjects walking into the business at 1:57 p.m. The surveillance video from the GoLo Luke's Gas Station in Hammond, Indiana, depicted the suspect vehicle at 1:30 p.m.

¶ 25    Following this evidence, the State rested. Defendant moved for a directed verdict, which was denied.

¶ 26                    *Defendant's Testimony & Jury Finding*

¶ 27    Defendant testified on his own behalf denying that he was present at the scene or involved in planning the armed robbery. Defendant testified instead that on the day in question he spent the night with his girlfriend but was then dropped off at Parker's home (78th an Yates) around 9 a.m. Around 1 p.m., defendant and Parker went to GoLo in Hammond, Indiana, in a white Lincoln Town car to get gas. Defendant identified himself in the video surveillance from the gas station (on cross, he specifically acknowledged the video showed him getting out of the white Lincoln and going into the store). Parker and defendant then went to 108th and Hoxie, about five minutes from the gas station. There were a number of people there, including Cornelius and Carter. A short while later, Cornelius, Carter, and Parker left in the white Lincoln, but defendant did not know where they were going. Instead, defendant "kicked" it with his girlfriend, Zsa Zsa Banks, and "smoked weed, played cards, talked shit." While Cornelius and

Carter returned that evening, Parker did not. Cornelius "was shook up like something happened," and then Cornelius and defendant "talked for hours and [Cornelius] told [defendant] what happened with the robbery." Cornelius also had money on him when he returned. Defendant didn't know they were going to commit a robbery beforehand. Defendant denied leaving the neighborhood that day.

¶ 28     Defendant claimed he found out about the crimes the next day. He was driving Parker's car with keys he'd gotten from Cornelius when police stopped him. Defendant only spoke to police because they told him on several occasions that they would release him if he "told them what [he] knew." Defendant initially told police that he had not been involved in the robbery but confessed his involvement only after the video recording stopped.[3] He noted his story had to match what Cornelius told him for "it to make sense." Defendant was interviewed several more times and essentially admitted that he was in the car during the robbery and that Williams had been one of his girlfriends. Yet, while defendant had spent time in Boost, he never asked about any security cameras, the safe, or how much money was in the cash register. He was not "looking to rob her store."

¶ 29     On cross, defendant acknowledged that during his interview he understood he was being recorded and everything he said to officers could be used against him at trial, and yet, he kept talking. Defendant admitted having told investigators about his involvement in the crimes, yet continued to claim his inculpatory videotaped statements were coerced.

¶ 30     Defendant rested. Following evidence and argument, the jury acquitted defendant of the first degree murder charge but found him guilty by accountability of armed robbery while armed with a firearm. Defendant filed a posttrial motion, which was denied.

_____

[3]On cross, defendant acknowledged testifying at the motion to suppress hearing that police made this promise after he was taken to his cell (not when the video recording stopped).

¶ 31                                    *Sentencing*

¶ 32    The cause proceeded to sentencing, and it was noted that defendant faced a sentence of 6 to 30 years for armed robbery, plus a mandatory 15-year add-on for having inflicted great bodily harm on the victim via a firearm, to be served at 85 percent. See 720 ILCS 5/18-2 (West 2014); 730 ILCS 5/5-4.5-25(a) (West 2014). The State presented and published four victim impact statements, including from the victim's mother, who noted that Lloyd was her only son; the victim's ex-wife, who noted Lloyd was only 45 years old, they were both expecting to be grandparents, and their son struggled with the loss of his dad; the victim's sister, who noted that Lloyd was her only brother; and Norfleet, who discussed her intense pain on losing Lloyd. Lloyd's sister and ex-wife both asked for the maximum penalty, respectively claiming "these criminals did not care or consider that my brother's life mattered[,]" and "[a]t least [defendant's] family would be fortunate enough to see him even if it is behind bars. Unfortunately, our family can't say the same. We have to go to an empty gravesite and talk to our loved one but leave with the void of never hearing him speak back to us."

¶ 33    Defendant presented several statements to the court, which were published, including one from his pastor who had known him prior to his incarceration. The pastor noted defendant would not hurt anyone deliberately, he had a caring sensibility to others, and accepted responsibility for his actions. The second was from his girlfriend who stated she had known defendant for 10 years, and he was a "gentle soul" who would not seek to hurt another. She noted he was a devoted father to his 8-year-old child and had been reformed during his incarceration. She asked for leniency.

¶ 34     In aggravation, the State argued that defendant orchestrated and planned the armed robbery that cost Lloyd his life. The State noted that defendant admitted having a relationship

11

with the store clerk, Williams; having been to her store on multiple occasions; having spoken with Parker about the armed robbery; knowing that when Parker and Carter entered Boost, they were armed; and driving the getaway vehicle. The State noted defendant had a pending public indecency charge for masturbating in a room while on the phone. Defendant's history also showed 12 other separate infractions incurred over five years while incarcerated and awaiting trial, including: fighting multiple times, battery, bribery, disobeying or resisting orders, disrespecting staff, failing to maintain sanitary and orderly conditions, disorderly conduct, uniform violations, telephone abuse, tattooing, and unauthorized drug possession and medication misusage. Based on the foregoing, the State asked that defendant be sentenced to the maximum allowed, 45 years.

¶ 35    In mitigation, defendant argued that the jury found him not guilty of murder and that he had no prior felony convictions. Counsel maintained defendant did not produce a gun, enter the store, or shoot anyone. Rather, "[t]his is something stupid that he did to try and get some money." Counsel asked that the court overlook the jail infractions. Counsel further noted that defendant was close with his siblings and had the support of his girlfriend and pastor. Counsel argued against giving defendant the maximum for a first-time offense, asserting that defendant could still become a valuable member of society. Defendant prepared a statement, which counsel read to the court. Defendant offered condolences to the Lloyd family, stating that if he could change what happened, he would. Defendant asserted that he had been rehabilitated during his five years of incarceration by reading books and attending barber college.

¶ 36    The court reviewed the letters offered by both the defense and the State, defendant's presentence investigation report, and defendant's comments. In mitigation, the court noted defendant's abusive childhood, wherein he was transferred to several foster homes, and endured

drug usage and physical abuse in the home. Although defendant completed only the 11th grade, he had obtained his G.E.D. while incarcerated. Defendant had some employment history. He was engaged and had a relationship with his two children, including his 8-year-old daughter, who would experience hardship due to defendant's incarceration. Defendant reported previous drug usage, but denied anything current. The court noted defendant's lack of adult felonies.

¶ 37    In aggravation, the court observed that while defendant was acquitted of Lloyd's murder, and the court would not punish defendant for a crime for which he was acquitted, there was no question that Lloyd lost his life during this armed robbery. The court found the murder still could be considered in aggravation because it was not an element of the armed robbery offense. The court observed that defendant was at Boost with Williams, casing the store a week in advance, and the cohort targeted this particular store because defendant was familiar with it. According to the court, the only reason defendant did not enter was fear that Williams would recognize him. The court further observed that although defendant told his codefendants not to harm Williams, he likewise went with Parker to obtain the gun used in the robbery. Thus, defendant knew this would be an armed robbery. Based on the foregoing, the court found defendant played a major role in setting up the crime and the court could not say such conduct would not occur in the future. Considering all the factors, including that great bodily harm was inflicted during the armed robbery, the court sentenced defendant to 33 years' imprisonment, to be served at 85 percent. The court noted the aggravating factor of deterrence applied. Defendant's motion to reconsider the sentence was denied. This appeal followed.

¶ 38                                    ANALYSIS

¶ 39    Defendant now challenges the sufficiency of the evidence to sustain his conviction. When considering such a challenge, we must determine whether, after viewing the evidence in a light

most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Walls*, 2022 IL App (1st) 200167, ¶ 17. Under this standard, it's for the trier of fact to fairly resolve any conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *People v. Siguenza-Brito*, 235 Ill 2d 213, 224 (2009). As a reviewing court, we will not substitute our judgment for that of the trier of fact on issues involving the weight of the evidence or witness credibility. *Id.* at 224-25. A conviction will not be set aside on appeal unless the evidence is so unreasonable, improbable, or unsatisfactory that there remains a reasonable doubt of the defendant's guilt. *People v. Wright*, 2017 IL 119561, ¶ 70.

¶ 40    To prove defendant guilty of armed robbery, the State was required to establish that defendant, or one for whom he was legally responsible, knowingly took "property from the person or presence of another by the use of force or by threatening the imminent use of force" and while armed with a firearm. 720 ILCS 5/18-1, 18-2(a)(2), 5-2 (West 2014). In addition to the elements of the offense, the State had to prove that defendant was accountable, insofar as either before or during the commission of the armed robbery, and with the intent to promote or facilitate that commission, he solicited, aided, abetted, agreed, or attempted to aid his cohort in the planning or commission of the armed robbery. See 720 ILCS 5/5-2(c) (West 2014). In other words, the State had to prove beyond a reasonable doubt that either defendant shared the criminal intent of the principal, or there was a common criminal design. *People v. Perez*, 189 Ill. 2d 254, 266 (2000). Intent may be inferred from the character of the defendant's acts and circumstances surrounding the offense. *Id.*

¶ 41    Further, under the common-design rule, where two or more people engage in a common criminal design or agreement, any acts in furtherance committed by one party are considered the

acts of all parties, and all are equally responsible for those further acts. *People v. Fernandez*, 2014 IL 115527, ¶ 13; *Walls*, 2022 IL App (1st) 200167, ¶ 20. Evidence that a defendant voluntarily attached himself to a group bent on illegal acts with knowledge of its design supports an inference that he shared the common purpose and will sustain his conviction for an offense committed by another. *Id*. In addition, proof that a defendant was present during the offense, that he fled from the scene, that he maintained close ties with his companions after the crime, and that he failed to report the crime are all factors that the trier of fact may consider in determining the defendant's legal accountability. *Walls*, 2022 IL App (1st) 200167, ¶ 20.

¶ 42     Here, viewing the evidence in a light most favorable to the State, as we must, we cannot say it was so unreasonable, improbable, or unsatisfactory as to raise a reasonable doubt of defendant's guilt, where it showed that defendant, along with his criminal cohort, committed the following acts in furtherance of the armed robbery. See *id*. First, one week prior to the offenses, defendant went with Williams to Boost, which ostensibly lacked both security guards and cameras. Williams testified defendant spent almost the entire day with her, after having visited the store on five or six prior occasions, and that they specifically went to the back of the store where the safe was located. Second, prior to the incident, defendant admittedly obtained a gun, along with Parker, for the purposes of using it in the armed robbery. Beforehand, defendant admittedly told Parker of the store set-up and lack of cameras.

¶ 43     Third, defendant then admittedly drove in the car with cooffenders Parker and Carter to Boost on the day in question, and waited there while Parker and Carter subsequently entered the store and committed the armed robbery and murder of Lloyd. See 720 ILCS 5/5-2 (2014) (presence at the crime scene with other circumstances may be considered). Defendant knew Parker was carrying the Babolat tennis bag, containing the gun, into the store. Defendant

admittedly drove the getaway vehicle with Carter, the unarmed robber, they searched for Parker, the gunman, who had run from the crime scene, and defendant received proceeds from the armed robbery. He did not report the crime. Last, the next day, police observed defendant driving this same getaway vehicle (registered to Parker) after Cornelius (who was also present at the armed robbery) looked in both directions from the house in an apparent attempt to check for authorities.

¶ 44    In addition to defendant's admissions, the physical evidence revealed that Parker's DNA was associated with the white mask, which both Williams and Norfleet identified at trial as the mask Parker wore. The register from the store contained only loose change, and the gun police recovered from the apparently bloodied Babolat tennis bag (which defendant described) was the same used in the murder of Lloyd with spent shell casings left at Boost. DNA from Parker was discovered on Lloyd and DNA from Lloyd was discovered on Parker, confirming their struggle as described by Norfleet and Williams. Norfleet and Williams testified in a manner that was largely consistent as to the crimes. And, video surveillance confirmed defendant's presence and/or that of the same white Lincoln at businesses near Boost both before and around the time of the crimes on the day in question.

¶ 45    Based on this evidence, the jury reasonably could have concluded that, using his girlfriend as a pawn, defendant cased the telephone store for the purposes of committing the armed robbery and acted in concert with his criminal cohort, conveying this information and then engaging in the armed robbery that led to Lloyd's demise. See *Perez*, 189 Ill. 2d at 266; *People v. Craigen*, 2013 IL App (2d) 111300, ¶ 36; *People v. Ivory*, 333 Ill. App. 3d 505, 511 (2002). The jury also reasonably could have concluded that defendant remained in the vehicle for fear that Williams would recognize him and that Parker wore a mask during the armed robbery for that reason, while Carter did not. As the trial court determined at sentencing, the above-stated

evidence supported a finding that defendant played a major role in the armed robbery and bodily harm inflicted on Lloyd. See *Perez*, 189 Ill. 2d at 268 (a defendant must intentionally aid or encourage the crime's commission for guilt to attach); *In re W.C.*, 167 Ill. 2d 307, 338 (1995) ("accountability may be established through a person's knowledge of and participation in the criminal scheme, even though there is no evidence that he directly participated in the criminal act itself"); *People v. Velez*, 388 Ill. App. 3d 493, 514 (2009) (a party may be accountable with some advanced knowledge of the criminal plan).

¶ 46    Defendant nonetheless claims that Williams' testimony was incredible due to her bias and motive to testify falsely against him. We reject this contention out of hand. Williams' potential bias as a jealous girlfriend (due to defendant's multiple paramours) was fully explored at trial. Williams' supposition — upon realizing that Parker was the armed robber — that defendant had to be involved in the crime was also reasonable given that defendant spent a great deal of time in Boost with Williams and then sent his brother, whom Williams' barely knew, to do his dirty work. It was for the jury in this instance to evaluate Williams' credibility and the weight to accord the evidence. See *Siguenza-Brito*, 235 Ill 2d at 228 (a reviewing court will not reverse a conviction simply because the defendant claims that a witness was not credible); *People v. Nesbit*, 398 Ill. App. 3d 200, 209 (2010).

¶ 47    Defendant also challenges the believability of his videotaped admissions. He points to the malfunctioning video equipment and insists, contrary to the officer's testimony at trial, that police promised he could go home only if he provided an inculpatory statement. He contends his brother Cornelius instead told him all the details of the crime, and he was not involved. This, too, was fully explored before the jury. Again, it is the jury's job, not ours, to determine witness credibility, weigh evidence, and resolve any conflicts in the evidence. See *id*. Also, a trier of fact

need not accept any possible explanation compatible with the defendant's innocence and elevate it to the status of reasonable doubt. *Id*. at 229. We note that the total evidence, including defendant's relationship with Williams and the video surveillance, contradicts defendant's claim that his inculpatory statements were incredible. We also have reviewed the video evidence of defendant's statements in full, and it is consistent with the officer's testimony that the equipment inadvertently quit working. Indeed, in the third interview, the officer noted he had a problem with the video and requested that defendant repeat his story once again. Moreover, on appeal, defendant does not challenge the denial of his motion to suppress, which focused on this issue.[4] We thus reject his back-door approach to attacking his admissions under the sufficiency of the evidence. For all these reasons, defendant's challenge to the sufficiency of the evidence fails.

¶ 48                                  *Sentencing*

¶ 49      Last, defendant contends that the trial court abused its discretion in sentencing him to 33 years' imprisonment. The sentence for armed robbery, a Class X offense, is 6 to 30 years. See 720 ILCS 5/18-2 (West 2014); 730 ILCS 5/5-4.5-25(a) (West 2014). In addition, defendant was subject to a mandatory 15-year add-on for having inflicted great bodily harm on the victim via a firearm. *Id*. Defendant now argues that with his minimal criminal background, community support, and expressions of remorse and rehabilitation, he should have received a lesser sentence. We disagree.

¶ 50      The sentencing decisions of a trial court are entitled to great deference and weight because a trial judge is in a far better position to fashion an appropriate sentence after considering a defendant's credibility, demeanor, moral character, mentality, social environment,

---

[4]In rejecting defendant's motion to suppress statements, the court expressly found the video cut short unintentionally, and there was no foul play by police. The court further found police did not make any promises to defendant outside his custodial interrogation that was recorded.

habits, age, and other relevant factors. *People v. Fern*, 189 Ill. 2d 48, 53 (1999); *People v. Cox*, 377 Ill. App. 3d 690, 709 (2007). A sentence within the statutory guidelines is presumptively correct, and a trial court's sentencing decision will not be disturbed, absent an abuse of discretion. *People v. Knox*, 2014 IL App (1st) 120349, ¶ 46; *Cox*, 377 Ill. App. 3d at 709.

¶ 51     During the sentencing hearing, the court carefully considered the letters offered in support of the defense and the State, defendant's presentence investigation report, defendant's elocution, and the required sentencing factors. The court noted various mitigating factors, including defendant's abusive childhood, his educational progress, family situation, and lack of adult criminal history.[5] The court also noted various aggravating factors, including defendant's advanced casing of the store, acquisition of the gun with Parker, and knowledge of the armed robbery. The court concluded that defendant played a "major role" in the armed robbery. Given the seriousness of the offense, which resulted in great bodily harm inflicted on Lloyd, the fact that the court believed such conduct could occur in the future, and the matter of deterrence, the court sentenced defendant to 18 years for the armed robbery, plus the 15-year mandatory add-on, for a total of 33 years. See *Cox*, 377 Ill. App. 3d at 709 (noting, the seriousness of the crime is the most important factor in fashioning a sentence).

¶ 52     While defendant now points to evidence demonstrating his rehabilitative potential, reformation, and remorse, he omits that during his incarceration in county jail he committed a number of infractions that contradicted his claim of reformation. Regardless, a trial court is not required to give greater weight to a defendant's rehabilitative potential than to the seriousness of

---

[5]We note that at sentencing, the State expressly said it was not relying on defendant's juvenile offenses (which included theft, giving false information, and unauthorized use of a vehicle) and asked the court not to consider them. There is no indication the court did so. Instead, the court stated, "the defendant has no prior history of criminal activity that applies." We thus disregard defendant's focus on those juvenile offenses in his brief.

the offense. *People v. Alexander*, 239 Ill. 2d 205, 214 (2010). Likewise, it was the court's job to evaluate defendant's credibility and that of those who spoke on his behalf. Apparently, the court did not believe defendant's claims of total reformation. See *Fern*, 189 Ill. 2d at 53.

¶ 53     Here, in balancing the society's interests against defendant's rehabilitative ability, as required, the court issued an eminently reasonable sentence. It was exactly in the middle of the minimum (21 years) and maximum (45 years) allowed, and consistent with the evidence presented, the nature of the offense, and the law. See *People v. Boyd*, 2021 IL App (1st) 182584, ¶ 88; *Cox*, 377 Ill. App. 3d at 709; see also *Fern*, 189 Ill. 2d at 54 ("A sentence within statutory limits will not be deemed excessive unless it is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense"); *cf. People v. Margentina*, 261 Ill. App. 3d 247, 250 (1994) (finding the trial court abused its discretion in sentencing the defendant to over twice the minimum given that the defendant was a teenager from an abusive home when he murdered a man who had provoked him with harassing conduct). Moreover, neither party disputes that defendant must serve the sentence at 85 percent, making his sentence potentially closer to 28 years. We decline defendant's invitation to reweigh the sentencing factors and conclude there was no abuse of discretion. See *Alexander*, 239 Ill. 2d at 214.

¶ 54                                   CONCLUSION

¶ 55     For the above-stated reasons, we affirm the judgment of the circuit court.

¶ 56     Affirmed.